UNITED STATES of America, Plaintiff–Appellee,

v.

Truman TOLSON and Darrell Tolson, Defendants–Appellants.

Nos. 91–1634, 91–1720.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1992.

Decided March 19, 1993.

Andrew B. Baker, Jr., Asst. U.S. Atty. (argued), Office of the United States Attorney, Dyer, IN, and William T. Grimmer, Asst. U.S. Atty., Office of the United States Attorney, South Bend, IN, for plaintiff-appellee.

Anthony D. Kowals (argued), Allen, Fedder, Herendeen & Kowals, South Bend, IN, Thomas J. O'Brien, Donahue, O'Brien & Morrissey, Lafayette, IN, for defendants-appellants.

Before POSNER and COFFEY, Circuit Judges, and SHADUR, Senior District Judge.*

COFFEY, Circuit Judge.

Darrell and Truman Tolson pled guilty to one count of participating in a conspiracy to distribute, and possessing with intent to distribute, marijuana in violation of 21 U.S.C. § 846. Truman Tolson was sentenced to 178 months of confinement while Darrell Tolson was sentenced to 198 months. Each of the defendants has appealed his sentence.

## I. BACKGROUND

Darrell Tolson and his father, Truman Tolson, are two of the many defendants indicted in the Rector family marijuana conspiracy that operated in Northern Indiana. The Rector conspiracy harvested a low grade marijuana called "ditchweed" that grows wild in Northern Indiana. After harvesting and packaging the ditchweed, the conspirators transported it to New York City for resale.[1]

* The Honorable Milton I. Shadur, Senior Judge for the Northern District of Illinois, is sitting by designation.

1. The ditchweed is mixed with a higher grade marijuana and offered for sale at a higher price. In 1986 and 1987, the ditchweed was delivered to Florida and then transported to New York. After a seizure of their drug proceeds in New York, the conspirators decided to deliver the ditchweed directly from Indiana to New York rather than risk another seizure.

Darrell Tolson played a more active role in the conspiracy than his father, Truman. In 1986, for instance, Darrell conveyed marijuana by auto to Doug Rector in Florida. Truman Tolson and Kenny Ford accompanied Darrell, but traveled in a separate vehicle. In Miami, Doug Rector and Leslie Allen delivered $9000 in cash to the Tolsons' hotel room in payment for the marijuana. Because Darrell was not present at the time, Leslie Allen suggested they leave the money "with Darrell's dad." Truman directed them to place the $9000 in a dresser drawer. At the sentencing hearing, Truman testified that he was unaware that the purpose of the Florida trip was to deliver marijuana until he took possession of the money. The district court found this testimony incredible in light of all the facts and circumstances. Furthermore, we have been unable to discover any evidence in the record demonstrating that Truman had withdrawn from the conspiracy after his involvement in 1986.

Darrell Tolson had previously participated in marijuana deliveries for the Rectors in 1983, 1984, and 1985 but the evidence fails to link Truman to these deliveries.

In 1988, the Rector organization was in disarray because of the arrests of several Rector family members and, as a result, the drug conspiracy was in need of new faces to assist in the operation. After Doug Rector's arrest in May 1988, Rex Froedge directed the harvesting of marijuana in Indiana and arranged for transportation of that marijuana to "Junior" Richards in New York. In August 1988, Mike Rector escaped from Indiana State Prison and took over management of the marijuana operation from Froedge. Shortly after assuming the leadership role, he contacted Darrell Tolson to assist in the harvest and delivery of the marijuana. Darrell and Truman participated in the harvesting, packaging, and transportation of the marijuana to couriers who in turn delivered it to New York City. On at least one of these occasions both Truman and Darrell met Mike Rector who at that time was directing the shipment of marijuana from Indiana to New York. Darrell received $60 to $80 per pound for his involvement in the conspiracy. Darrell paid Truman a total of $3000 for Truman's participation.

One issue in this case is the quantity of marijuana attributable to Truman Tolson in the conspiracy for sentencing purposes. Truman actively participated in three ditchweed deliveries under Mike Rector's direction in November 1988 involving roughly 358 pounds. The total amount of marijuana delivered by the conspiracy to New York under Mike Rector's direction from early August until December of 1988 was between 500 and 2000 pounds (including the 358 pounds). The amount transported by Rex Froedge from April 1988 to August 1988 prior to Mike Rector's escape from prison totaled anywhere from 1000 and 3500 pounds. From early in 1986 until December of 1988, the Rector organization delivered approximately 18,500 pounds of marijuana.[2] The district court determined that it was proper to hold Truman responsible for not only the 358 pounds he actively transported in furtherance of the conspiracy but also for the total amount delivered by the conspiracy under Rex Froedge's and Mike Rector's direction from May to December 1988.

## II. ISSUES

Defendants Truman and Darrell Tolson appeal their sentences on the following grounds. Truman argues (1) that the district court erred in denying him a two-point reduction for acceptance of responsibility under § 3E1.1 of the Sentencing Guidelines; (2) that the court erred in assessing two criminal history points based on his involvement in the conspiracy while on probation for a separate offense in 1986; (3) that the district court erred in holding him responsible for any quantity of marijuana in excess of the 358 pounds he personally helped to transport; and (4) that the district court abused its discretion by failing to grant him a two-level reduction for his minor participation in the conspiracy. Dar-

---

**2.** For further details of the Rector family conspiracy, see United States v. Paiz, 905 F.2d 1014, 1017–18 (7th Cir.1990), cert. denied, —— U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991).

rell appeals only the question of whether the district court erred in refusing to grant him a two-level reduction for acceptance of responsibility.

## III. DISCUSSION

### A. Acceptance of Responsibility

■ Both Darrell and Truman Tolson claim that the court's failure to grant a two-level reduction for acceptance of responsibility denied them their Sixth Amendment right to counsel. The Tolsons pled guilty to Count 2 of the indictment on the morning of trial. They claim that their late plea was a result of the government's failure to disclose through their attorneys important discovery material until just before trial. They argue that without this discovery material, they were unable to evaluate the strength of the government's case. The government replied that they had made available substantial discovery material early on in the proceeding pursuant to 18 U.S.C. § 3500, and that the material that arrived just days before trial resulted from the ongoing DEA investigation and did nothing more than corroborate the evidence previously made available.

■ Section 3E1.1(a) of the Sentencing Guidelines provides for a two-level reduction in the sentencing offense "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." Section 3E1.1(c) adds "[a] defendant who enters a guilty plea is not entitled to a sentencing reduction under this section as a *matter of right.*" (Emphasis added). Application Note 5 to § 3E1.1 states: "The sentencing judge is in a unique position to

evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless it is without foundation." [3] We defer to the sentencing judge when weighing the defendant's credibility regarding his acceptance of responsibility because the judge has the best "opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements," as well as confused or nervous speech patterns *in contrast with merely looking at the cold pages of an appellate record. Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir.1992).

■ We extend great deference to the district court's § 3E1.1 determination because "[t]he clearly erroneous standard of review for findings of fact in the sentencing context is mandated by Congress. 18 U.S.C. § 3742(e)." *United States v. Beal,* 960 F.2d 629, 632 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992). Thus, "a district court's sentence will be affirmed if it results from a proper application of the Sentencing Guidelines to facts not found to be clearly erroneous." [4] *Id.* "An appellant attempting to overturn a district court's § 3E1.1 determination carries a heavy burden." *Id.* Finally, the defendant must establish his right to the acceptance of responsibility reduction by a preponderance of the evidence. *United States v. Howard,* 894 F.2d 1085, 1090 (9th Cir.1990) (relying on *McMillan v. Pennsylvania,* 477 U.S. 79,

---

**3.** "The commentary to the Guidelines, which includes the Application Notes, is to be treated as the legal equivalent of a policy statement. Guidelines § 1B1.7." *United States v. Larsen,* 909 F.2d 1047, 1049 (7th Cir.1990).

**4.** Application Note 1 provides:
"In determining whether a defendant qualifies for this provision, appropriate considerations include, but are not limited to, the following:
"(a) voluntary termination or withdrawal from criminal conduct or associations; (b) voluntary payment of restitution prior to adjudication of guilt; (c) voluntary and truthful

admission to authorities of involvement in the offense and related conduct; (d) voluntary surrender to authorities promptly after commission of the offense; (e) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense; (f) voluntary resignation from the office or position held during the commission of the offense; and (g) the *timeliness* of the defendant's conduct manifesting the acceptance of responsibility."
U.S.S.G. § 3E1.1, Application Note 1 (emphasis added).

91–92, 106 S.Ct. 2411, 2418–19, 91 L.Ed.2d 67 (1986)); *see also United States v. Burrell*, 963 F.2d 976, 994 (7th Cir.1992) (applying a preponderance of the evidence standard at sentencing), *cert. denied sub nom. Henry v. United States*, — U.S. —, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992).

The record before us reveals that Truman Tolson is an elderly man suffering from poor health and since he possesses only an elementary school education, his understanding of the written word might very well be somewhat limited. Both Truman and Darrell claim that they relied extensively on their court-appointed counsel to assist them in reviewing and understanding the government's evidence against them. Additionally, Darrell argues that had he pleaded guilty without first consulting his father,[5] it would have adversely impacted his father's case. They now claim that the district court's denial of acceptance of responsibility effectively penalized them for exercising their right to counsel pursuant to the Sixth Amendment. The question before us is whether the sentencing judge may consider the *timeliness* of a defendant's acceptance of responsibility and the impact of the entry of a last minute plea may have if any on a defendant's right to counsel. This Circuit recently addressed a similar argument that denial of the acceptance of responsibility reduction violates a defendant's Sixth Amendment right to trial. In *United States v. Saunders*, 973 F.2d 1354 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1992), the court held "the approach embodied in § 3E1.1 does not constitute a *per se* policy of punishing those who elect to stand trial, despite the fact that leniency is more often granted to defendants who accept responsibility by pleading guilty." *Id.* at 1362. *Saunders*, relying principally on plea bargain cases, reaffirmed that showing leniency to a contrite defendant is not unconstitutional. *Id.* at 1363; *Corbitt v. New Jersey*, 439 U.S. 212, 219, 99 S.Ct. 492, 497, 58 L.Ed.2d 466 (1978) ("not every burden on the exercise of a constitutional right

and not every encouragement to waive such a right is invalid"); *Brady v. United States*, 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970) (the government may extend a benefit to a defendant who demonstrates acceptance of responsibility). The *Saunders* court further noted that:

"[a]s long as the leniency decision is an individualized one, not based merely on the defendant's decision to go to trial, a defendant's constitutional rights are not impaired.... Application Note 2 to § 3E1.1 makes clear that it leaves the door open to defendants who exercise their right to trial. It declares that in 'rare situations' a defendant who proceeds to trial may qualify for an acceptance of responsibility reduction, particularly if the defense theory at trial rested on issues other than factual guilt (e.g., the constitutionality of a criminal statute)."

*Saunders*, 973 F.2d at 1363 (citation omitted).

■ The Tolsons' appeal presents a similar issue and an opportunity for this court to further explain the acceptance of responsibility doctrine as it relates to the Sixth Amendment. The trial judge found that the government had made substantial discovery disclosures available to the Tolsons well in advance of trial. The court also found that the discovery material made available just prior to trial disclosed no new evidence because it merely corroborated the earlier discovery disclosures and it resulted from an ongoing investigation. This finding was not clearly erroneous. The defendants fail to recognize that the acceptance of responsibility reduction is nothing but the court's "show [of] leniency based on an expression of remorse" and not a decision to penalize the defendant who exercises his right to counsel or right to a fair trial. *Id.* The Guidelines make clear that a defendant's acceptance of responsibility must be made in a *timely* fashion and not at the moment of trial as a last minute

---

**5.** The weekend before the trial, Truman and Darrell were moved to the same prison cell in South Bend, Indiana, where they were able to

visit for the first time since their detention hearing.

attempt to escape greater punishment. Thus we affirm the reasoning of the district court judge who declared that "waiting to see the government's cards [before entering a guilty plea] is not entirely consistent with clear acceptance of responsibility...." *United States v. Tolson,* 760 F.Supp. 1332, 1335 (N.D.Ind.1991).

The district court correctly reasoned that the lack of timeliness of the Tolsons' guilty plea warranted the denial of their acceptance of responsibility argument. The reduction for a timely acceptance of responsibility was not adopted with the idea that a defendant might lessen his or her sentence with a last minute, formalistic demonstration of remorse after the government has been forced to expend a great deal of time and resources in gathering an overwhelming case. *See United States v. Franklin,* 902 F.2d 501, 505–06 (7th Cir.) (denying reduction to defendant because he was "motivated more by [his] concern to improve his potential disposition than by true remorse"), *cert. denied sub nom. Mann v. United States,* 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990). It does not take a genius to recognize when one is up against insurmountable odds. We hold that the district court's refusal to grant the Tolsons a reduction for acceptance of responsibility was not clearly erroneous and falls far short of impinging upon their Sixth Amendment right to counsel.

Practical concerns and common sense also dictate that defendants manifest their acceptance of responsibility in a timely fashion. In this case, the jury had been empaneled and the trial docket had been cleared for the trial. Since no other cases were scheduled, the last minute change of plea merely served to create a vacuum in the trial court's calendar thus wasting the court's precious time and resources. Last minute pleas contribute to the delays and backlog that plague federal and state court dockets. Not only are jurors and witnesses inconvenienced because they have been summoned at great expense to the public but also the trial court has allocated trial time that cannot be immediately filled by another case because witnesses and counsel are not immediately available and can-not lay aside their other daily responsibilities and endeavors at the drop of a hat.

## B. Criminal History Points

■ Truman Tolson asserts error in the district court's finding that he joined the conspiracy in 1986 resulting in a two-point increase in his criminal history because he was on probation for a separate offense until 1987. Section 4A1.1(d) of the United States Sentencing Guidelines provides: "Add two points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status."

We find no need to discuss whether Truman Tolson knowingly participated in the conspiracy in 1986 "because his [argument] on appeal is undermined by the language of the indictment to which he knowingly and intelligently pleaded guilty" with the assistance of counsel. *United States v. Savage,* 891 F.2d 145, 150 (7th Cir.1989). Truman Tolson, testifying in response to the trial court's questioning at his change of plea hearing, stated that his attorney read and explained the petition and the entry of a guilty plea to him. Truman stated that he understood and had signed the petition to enter his plea of guilty. Thereafter, the district court thoroughly explained the sentencing procedures under the Sentencing Guidelines and asked whether anyone had promised or predicted to Truman what his likely sentence would be to which Truman answered in the negative. The following exchange took place under oath:

THE COURT: And, Truman Tolson, have you received a copy of the indictment?

DEFENDANT TRUMAN TOLSON: Yes, I have.

THE COURT: And have you reviewed that with Mr. Kowals?

DEFENDANT TRUMAN TOLSON: Yes, I have.

THE COURT: Are you satisfied that you fully understand all the words in the indictment and what it is they say you did?

DEFENDANT TRUMAN TOLSON: Yes.

THE COURT: Have you told Mr. Kowals everything that he needs to know about the case in order to represent you here in court and advise you as to how to proceed?

DEFENDANT TRUMAN TOLSON: Yes, sir.

THE COURT: Are you satisfied with the job he's done for you?

DEFENDANT TRUMAN TOLSON: Yes, sir.

THE COURT: Mr. Truman Tolson, has anybody used any force or made any threats against you to get you to do this?

DEFENDANT TRUMAN TOLSON: No, sir.

[The Court proceeded to read the indictment]

Change of Plea Hearing Transcript at 34–35. The indictment, which the district judge read into the record at the plea hearing, states

> "[t]hat beginning during the early part of 1986, ... and continuing thereafter, up to and including February 10, 1989, in the Northern District of Indiana, and elsewhere, ... Truman Tolson ... did knowingly, intentionally, and unlawfully combine, conspire, confederate and agree with each other and other individuals whose names are both known and unknown to the Grand Jury, to commit certain offenses against the United States of America, to-wit: knowingly and intentionally to distribute and to possess with intention to distribute a controlled substance, that is marijuana, a schedule one controlled substance, contrary to the provisions of Title 21, U.S.C., § 841(a)(1)."

Count 2 (emphasis added).

■ This court in *Savage* concluded that a defendant "[h]aving pleaded guilty to membership in the conspiracy as charged in the indictment knowingly and intelligently, and with the advice of counsel, ... has relinquished the right to challenge the conspiracy." *Id.* at 150 (citing *United States v. Broce*, 488 U.S. 563, 570, 109 S.Ct. 757, 763, 102 L.Ed.2d 927 (1989) (guilty plea cut off the right to show that multiple conspiracies confessed to were small parts of a single conspiracy)). The U.S. Supreme Court and the lower courts have made clear that "a guilty plea is an admission of all the elements of a formal criminal charge...." *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969); *see also Valencia v. United States*, 923 F.2d 917, 920 (1st Cir. 1991) ("It is well settled that a valid guilty plea waives all non-jurisdictional defects in the indictment."); *United States v. Scherl*, 923 F.2d 64, 66 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2272, 114 L.Ed.2d 724 (1991) ("[The defendant] failed to challenge the indictment before entering into the plea agreement, and this constitutes a waiver."); *United States v. Rivera Ramos*, 856 F.2d 420, 423 (1st Cir.1988), *cert. denied,* 493 U.S. 837, 110 S.Ct. 118, 107 L.Ed.2d 79 (1989) ("a defendant who pleads guilty may not later contest the factual and theoretical foundations of the indictment to which he has pled"); *United States v. Mathews*, 833 F.2d 161, 163 (9th Cir.1987) ("The affect of a guilty plea is well established: it ... 'conclusively admits all factual allegations of the indictment.'" (quoting *United States v. Benson*, 579 F.2d 508, 509 (9th Cir.1978))); *United States v. Hodge*, 674 F.Supp. 585, 590 (N.D.Ohio 1987) ("[B]y pleading guilty, defendant admitted all material facts alleged in the information. Having done so, he may not now seek to relitigate those facts by attacking his sentence under Rule 35.").[6] The authority

---

**6.** The Fourth Circuit recently decided a sentencing case posing a somewhat similar question but factually distinguishable. *See United States v. Gilliam*, 987 F.2d 1009 (4th Cir.1993). In *Gilliam*, the sentencing judge attributed 30 kilograms of cocaine to a defendant because of a lack of evidence concerning the quantity of drugs involved and because the indictment and guilty plea stated that the conspiracy distributed 30 kilograms. The Circuit Court, considering that Gilliam was challenging the quantity of drugs attributable to him, vacated the sentence because neither the plea agreement nor the indictment stated the quantity specifically attrib-

seems clear to us that a defendant who pleads guilty to an indictment voluntarily and with the assistance of counsel before a United States district court judge may not challenge the facts of the indictment on appeal.

Apparently, the concurrence does not place much weight on a guilty plea despite the fact that Truman (1) had the advice of counsel; (2) was questioned by the court; (3) signed and approved the plea agreement; and (4) had the indictment and sentencing proceedings thoroughly explained to him. The concurrence raises two arguments concerning Truman's plea. First it suggests that by "merely ... pleading guilty" Truman did not waive his right to challenge when he joined the conspiracy; Concurring Op. at 1505, and second, that "it was all or nothing," Truman could not plead guilty to a portion of the indictment. *Id.* at 1506. While this may be a defendant's choice in some criminal proceedings, in this instance Truman clearly had three additional options. First, he could have pled guilty to Counts 27–31 naming the specific acts he performed in 1988. Second, he might have requested leave of the court to tender a conditional plea agreement, pursuant to Fed.R.Crim.P. 11(a)(2), and thus attempt to reserve the right to argue during the sentencing hearing when he entered the conspiracy. *See United States v. Silverman,* 730 F.Supp. 1418, 1421 (S.D.Ohio 1990), *aff'd,* 976 F.2d 1502 (6th Cir.1992) (en banc). Of course, both the district court and the U.S. Attorney would have had to approve such a conditional plea. *See* Fed.R.Crim.P. 11(a)(2). In the event the conditional plea was rejected, Truman would have had the opportunity to proceed to trial on all counts or he could have continued with his guilty plea. Third, Truman might also have requested that the U.S. Attorney reindict him with a charge that he felt more accurately reflected his criminal acts. *See United States v. Scott,* 884 F.2d 1163, 1164 (9th Cir.1989), *cert. denied,* — U.S. ——, 113 S.Ct. 288, 121 L.Ed.2d 213 (1992). Thus, in signing the guilty plea to the conspiracy count beginning in 1986 with the advice of counsel and after questioning by the court, we can only assume Truman was admitting to all the facts in the indictment. Accordingly, he has waived the right to challenge when he joined the conspiracy.

■■ We have trouble understanding how Truman Tolson can argue on one hand that he has accepted responsibility yet on the other hand deny responsibility for the very offense to which he pled guilty. We conclude that based upon the record before us Truman has waived his right to appeal his participation in the conspiracy in 1986. Next, we proceed to determine the amount of marijuana for which Truman may be held accountable.[7]

utable to Gilliam, rather, they only spoke of the quantity that all nine conspirators distributed. The majority stated:

> Thus, while a plea of guilty to an indictment containing an allegation of the amount of drugs for which a defendant is responsible may, in the absence of a reservation by the defendant of his right to dispute the amount at sentencing, constitute an admission of that quantity for sentencing purposes, Gilliam's indictment did not make any such attribution. Moreover, recognition by the Government and defense counsel following the plea colloquy that the amount of cocaine attributable to Gilliam and several of his coconspirators remained unresolved strongly supports Gilliam's position.

*Id.* at 1013–14. Thus the majority acknowledges the need for a defendant to reserve factual issues in the plea agreement. The dissent, on the other hand, would have held that a guilty plea admits all factual elements of the indictment.

Therefore, absent evidence that the defendant reserved the issue in the plea, he may not challenge the facts in the indictment and plea agreement. *Id.* at 1016.

7. Two other grounds support our holding that Truman is not entitled to the two-point reduction in criminal history.

First, reducing his criminal history by two points would place Truman Tolson in criminal history category III with an offense level of 32 resulting in a sentencing range from 151–188 months. With two additional criminal history points he falls into category IV with a range of 168–210 months. His sentence of 178 months falls within the range of both category III and IV. This court has adopted the approach of not addressing "disputes such as this one if it is reasonable to conclude the same sentence would have been imposed irrespective of the outcome of the dispute." *United States v. Dillon,* 905 F.2d 1034, 1038 (7th Cir.1990) (applying

## C. Amount of Marijuana Attributable to Truman Tolson's Involvement in the Conspiracy

▇ Truman Tolson contends that the district court erred in holding him responsible for all the marijuana distributed by the conspiracy between May and December of 1988. We review the court's findings as to the facts under a clearly erroneous standard. *Beal*, 960 F.2d at 632.

Under the Sentencing Guidelines, "[t]he amount of narcotics considered in sentencing for conspiracy includes not only the amount involved in the transactions that were known to the defendant but also those that were reasonably foreseeable, reflecting the fact each conspirator is responsible for the acts and offenses of each one of his co-conspirators committed in the furtherance of the conspiracy." *Savage*, 891 F.2d at 151.[8]

As we previously mentioned, Truman Tolson knowingly and intelligently pleaded guilty to a conspiracy commencing in 1986 and thus, may be held responsible for all marijuana transactions (18,500 pounds) from 1986 through 1988 that were reasonably foreseeable to him. *United States v. Guerrero*, 894 F.2d 261, 266 (7th Cir.1990) ("A defendant who pleads guilty to a conspiracy charge is held accountable, for purposes of determining his relevant conduct in the applicable guideline range, for all drug transactions that he was aware of or that he should have reasonably foreseen."). The trial court found that Truman Tolson had only peripheral participation in the conspiracy in 1986 and following a two-year hiatus he renewed his drug activity in November 1988. Therefore, in the interest of fairness when considering all the facts and circumstances in this case, we agree with the decision of the district court not to hold Truman responsible for the entire 18,500 pounds.

The district court, as the trier of fact, not only has the authority but is in the best position to determine the amount of narcotics attributable to the conspiracy or any member of it. "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, ... similar transactions in controlled substances by the defendant...." U.S.S.G. § 2D1.4, Application Note 2. In discussing the 18,500 pounds of marijuana handled by the conspiracy, the district court found that the 500 to 2000 pounds of

---

this rationale to overlapping ranges produced by different criminal history categories).

Second, the district court found that Truman Tolson's involvement in the 1986 sale of marijuana from Darrell Tolson to Doug Rector in Florida initiated Truman Tolson's participation in the conspiracy. Findings of fact by the district court at sentencing are reviewed under the clearly erroneous standard. *Beal*, 960 F.2d at 632. The court found incredible Truman's testimony that he did not know of the marijuana transaction until the money was delivered. Matters of witness credibility are committed to the sound discretion of the trial judge. 18 U.S.C. § 3742(e) ("The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts."). In view of the record before us, as well as Truman's 1975 arrest for selling marijuana with his son Darrell, the 1986 transaction in Florida, a 1989 Indiana state conviction for marijuana sales, and the present offense, the district court was not clearly erroneous in finding Truman's participation in the conspiracy began in 1986, and thus the two points for criminal history were appropriately included.

8. Application Note 1 to § 1B1.3 provides:

"In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, *the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.* Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant. Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline." (Emphasis added).

marijuana handled after Mike Rector's escape was attributable to Truman Tolson (including the 358 pounds in which he directly participated). The court also included the 1000 to 3500 pounds of marijuana handled under Rex Froedge's direction between May and August 1988 for a total of 3000 to 4000 pounds. The district court reasoned that it was proper to hold Truman accountable for the marijuana from the Froedge era in view of the fact that Truman participated in the conspiracy in 1986 and then rejoined the ongoing conspiracy in 1988. The 3000 to 4000 pounds represents a fair and reasonable estimate of the amount of marijuana reasonably foreseeable by Truman Tolson.

Tolson argues that § 1B1.3, comment 1(e) is appropriate. The comment presents the hypothetical scenario of a defendant who "was hired only to help off-load a single shipment" and thus "[h]e is not accountable for prior or subsequent shipments of marijuana imported by [other defendants] if those acts were beyond the scope of, and not reasonably foreseeable in connection with, the criminal activity he agreed to jointly undertake with [the defendants]." U.S.S.G. § 1B1.3, comment 1(e). The district court concluded, and we are in agreement that comment 1(e) does not accurately describe Truman Tolson's participation. He was not "hired to help off-load a single shipment" but was an active participant in the drug conspiracy. He aided in harvesting and transporting three or four loads of marijuana, was present at another delivery (1986 in Florida) and knew of other conspirators involved in transporting the low-grade marijuana (ditchweed) to New York for resale.

Obviously it was reasonably foreseeable to Truman that the conspiracy handled more than 358 pounds. The 500–2000 pounds handled after Mike Rector's escape in August 1988 and the additional amounts handled by Rex Froedge between May and August 1988 were also reasonably foreseeable. Although Truman Tolson evokes our sympathy as a 60–year–old man in poor health, his actions in this conspiracy as well as his other drug convictions render unbelievable any claim that he was a novice,

ignorant of the scope or ramifications of the ditchweed operation. We conclude that the finding of the trial court that Truman was responsible for 3000–4000 pounds of marijuana was not clearly erroneous.

### D. Minor Participant

■ Truman Tolson argues that the court erred in denying him a two-level reduction as a minor participant under U.S.S.G. § 3B1.2(b). The government argues that Tolson has waived this issue by failing to raise it at the sentencing hearing. Tolson did not address the issue in the sentencing hearing but, in his objections to the pre-sentence report, he argued for a downward departure because "[b]ased upon Truman Tolson's age and health, together with his minimal involvement in this conspiracy, there should be a downward departure...." Addendum to Pre-sentence Report § IV(a). The district court construed Truman's request for a downward departure as a request for a minor participant reduction. *United States v. Tolson*, 760 F.Supp. 1322, 1331–32 (N.D.Ind.1991). The court noted that "The two-level reduction also is inappropriate. 'Minor participant' status has been denied to persons in analogous positions, such as a drug courier, ... a person who arranged a transaction without profit to self as a favor to a friend, ... [and] a driver." *Id.* (citations omitted). "Others, including Darrell Tolson, may have been more culpable than Truman Tolson, but that is not the test for reduction based on role in the offense." *Id.* Considering the totality of the drug operation, we agree with the trial court that he was not entitled to a two-level reduction. We review the district court's determination under a clear error standard. *United States v. Navarez*, 954 F.2d 1375, 1382 (7th Cir.1992).

The facts reveal that Truman Tolson's involvement was too extensive to consider him a minor participant. He assisted in harvesting the ditchweed for the conspiracy, transporting it to a rendezvous location and was aware of the magnitude as well as the other participants in the conspiracy. Truman's request seems to be premised on

the notion that federal judges have no knowledge of the drug culture. "[I]t strikes us as incredible that [a drug dealer] would have a person accompany him to a drug deal ... where that person did not have [the dealer's] utmost trust and confidence. Judges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world ..." *United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir.1984).

Moreover, Truman has undermined his argument that he was only a minor participant by his plea under oath:

THE COURT: Do you still want to plead guilty?

DEFENDANT TRUMAN TOLSON: Yes, sir.

THE COURT: What did you do, sir, that makes you guilty of this charge?

DEFENDANT TRUMAN TOLSON: I went along with my son Darrell Tolson.

THE COURT: When you say you went along, do you mean you went along for the ride or—

DEFENDANT TRUMAN TOLSON: The same thing that he did, I did, my son did.

THE COURT: Did you approve of what your son was doing? Did he ask for your assistance or your permission, or did you participate in it? When you say you went along with it, were you just riding in the front seat while he drove a car? Tell me what it involved.

DEFENDANT TRUMAN TOLSON: I drove a car by myself and he drove a car, loaded it and left.

THE COURT: So, when you say you went along with it, are you saying you did all the things that your son just said he did?

DEFENDANT TRUMAN TOLSON: Yes, sir.

THE COURT: In addition to that, I don't think you mentioned driving a car. You drove a car as well?

DEFENDANT TRUMAN TOLSON: Yes.

THE COURT: Was that in connection with Mike Rector?

DEFENDANT TRUMAN TOLSON: Yes.

MR. KOWALS [Truman's attorney]: Do you want me to ask some questions, your Honor?

THE COURT: If you would like.

MR. KOWALS: Mr. Tolson, in November of 1988 did you help your son Darrell load some marijuana into cars?

DEFENDANT TRUMAN TOLSON: Yes sir.

MR. KOWALS: And it was your understanding that that marijuana was loaded into the cars for the benefit of Mike Rector. Is that correct?

DEFENDANT TRUMAN TOLSON: That's correct.

MR. KOWALS: And how many times do you recall helping Darrell load?

DEFENDANT TRUMAN TOLSON: Three times.

MR. KOWALS: And that marijuana was picked by you and Darrell?

DEFENDANT TRUMAN TOLSON: Yes, sir.

MR. KOWALS: And did you receive any money for picking and loading that marijuana?

DEFENDANT TRUMAN TOLSON: Yes.

MR. KOWALS: How much money did you receive?

DEFENDANT TRUMAN TOLSON: Three thousand.

MR. KOWALS: And where did you think that marijuana was being taken?

DEFENDANT TRUMAN TOLSON: To New York.

MR. KOWALS: And for what purpose?

DEFENDANT TRUMAN TOLSON: For resale.

MR. KOWALS: And were Mike Rector's cars loaded in Starke County, Indiana?

DEFENDANT TRUMAN TOLSON: Yes, they were.

MR. KOWALS: And they were loaded by you and Darrell?

DEFENDANT TRUMAN TOLSON: Yes, sir.

MR. KOWALS: And I believe you recall another time when there were two couples present when you loaded the cars. Is that correct?

DEFENDANT TRUMAN TOLSON: That's correct.

MR. KOWALS: It was your understanding that one of them was Mike Rector. Is that correct?

DEFENDANT TRUMAN TOLSON: Correct.

MR. KOWALS: And you also recall, I believe, tell me if it is correct or not, that you were introduced at one time by your son Darrell to Mike Rector.

DEFENDANT TRUMAN TOLSON: That is correct.

MR. KOWALS: All this took place in November of 1988?

DEFENDANT TRUMAN TOLSON: To my knowledge, yes, sir.       .

Change of Plea Hearing Transcript at 44–47.

Application Note 3 to § 3B1.2 states "A minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." Clearly, Truman Tolson was no less culpable than any other participants, though his role may not have been as great as others. In *United States v. Tholl,* 895 F.2d 1178 (7th Cir.1990), the court refused a minor participant reduction to a defendant "simply because he did not concoct this scheme or take the lead...." *Id.* at 1186. In this case, Tolson clearly was not the ringleader, but "even though he neither thought up the scheme nor played the most active role ... [h]is participation in the scheme indicated a culpable desire to profit from this scheme." *Id.* We construe the minor participant status narrowly to avoid injustice, here, Tolson clearly is not entitled to a two-level reduction.

We restate that Truman Tolson, though deserving of consideration, was not an innocent, novice bystander. He willfully joined and participated in an extensive drug conspiracy to transport and sell marijuana.

Congress has dictated and we agree that severe sentences must be imposed for such offenders if we hope to halt the cancer of drugs on humanity. The district court properly applied the Sentencing Guidelines to both Truman and Darrell Tolson. Accordingly, the sentencing orders are

AFFIRMED.

SHADUR, Senior District Judge, concurring in the result.

Although the majority opinion assuredly reaches the correct result as to both Truman Tolson ("Truman") and his son Darryl—upholding the sentence imposed on each after their respective guilty pleas—I am constrained to express my respectful disagreement with one aspect of the opinion as to Truman, and to comment briefly on the recurring subject of acceptance of responsibility under the Guidelines. With this and all other appellate courts having been thrust into the business of sentencing on a major scale because of the Guidelines' advent, and with district courts thus having to pay heed to an expanding body of appellate case law, it is just as important that we always explain the correct reasons for our results as it is for us to be correct in the individual cases before us.

First, it cannot fairly be said that a defendant such as Truman, merely by his pleading guilty to a conspiracy count of an indictment that charges a multiplicity of defendants and that states a prolonged time frame for the operation of the conspiracy, has somehow waived the right to question the time frame of that individual defendant's own participation in the conspiracy. In this instance the use of ellipses in the majority opinion's quotation from the indictment (at 1499–1500) does not reflect that Truman and Darryl were only two of 12 individuals who were charged with having conspired, in the course of a conspiracy that began early in 1986 and continued through February 10, 1989, to distribute marijuana and to possess marijuana with the intent to distribute it. That point is recognized in passing at 1495, just as the ensuing background recital at 1495–96 reflects (as is typical of all such wide-ranging

conspiracies) that the various conspirators played differing roles and had differing levels of responsibility.

Cases are legion in which defendants enter and leave the ranks of conspiracies in progress.[1] Indeed, part of the standard instruction on conspiracy in this circuit (one of the necessary elements of which is that the government must prove beyond a reasonable doubt "that the defendant knowingly and intentionally became a member of the conspiracy")—an instruction that has consistently been approved by this court in the respect next referred to—is this (Federal Criminal Jury Instructions prepared by Committee on Federal Criminal Jury Instructions of the Seventh Circuit, 1980 (emphasis added)):

> To be a member of the conspiracy, *the defendant need not join at the beginning* or know all the other members or the means by which the purpose was to be accomplished. The government must prove beyond a reasonable doubt, from the defendant's own acts and statements, that he was aware of the common purpose and was a willing participant.

Moreover, if the majority's position (an asserted one-to-one correlation between a defendant's being guilty of a conspiracy charge and that defendant's having been a conspirator throughout its entire duration) were correct, why has it been necessary for all Courts of Appeals (including this one) to develop case law doctrines about the admissibility in evidence under Fed.R.Evid.

801(d)(2)(E) of statements that were made in furtherance of the conspiracy *before* the specific defendant joined? And why does part of Application Note 1 to Guideline § 1B1.3—a part that is included in the quotation (but is not italicized) at 1502 n. 8—expressly recognize that conspiracy counts are often "broadly worded and include the conduct of many participants over a substantial period of time, [so that] the scope of the jointly-undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant"?

To be sure, we said this on quite another waiver issue in *United States v. Savage*, 891 F.2d 145, 150 (7th Cir.1989):

> Having pleaded guilty to membership in the conspiracy as charged in the indictment knowingly and intelligently, and with the advice of counsel, Savage has relinquished the right to challenge the conspiracy.

But that accurate holding simply does not support the entirely different waiver doctrine stated in the majority opinion. It must be remembered that indictments, like diodes or computer chips, permit only two possible positions: "on" or "off," guilty or not guilty. Truman could not have entered a guilty plea to a slice of the conspiracy count—it was all or nothing.[2] By choosing to plead guilty, Truman (like Savage) gave up his "right to challenge the conspiracy"—and perhaps the right to challenge the duration of the conspiracy itself, if that

---

**1.** In this instance, for example, at 1495–96 accurately reflects that the leadership role in the conspiracy had to shift to others in May 1988—some nine months before the conspiracy came to its end—after the arrest of some of the ringleaders.

**2.** Page 1501 of the majority opinion seeks to deflect this point by suggesting three "options" supposedly available to Truman. But quite apart from the general proposition that appellate courts are not entitled to engage in revisionist history that is totally without record support, with all due respect that suggestion reflects a lack of understanding of the process by which guilty pleas are entered at the trial court level. Except for the entry of a "blind plea"—one in which a defendant pleads guilty to *all* charges in which he or she is named, without having reached any understanding with the prosecu-

tor—the nature and scope of the guilty plea are controlled by the prosecutor's absolute veto power. It is the prosecutor and not defense counsel who decides what count or counts will be the subject of the plea, because it is the prosecutor who must agree to move for dismissal of the remaining count or counts at the time of sentencing. And with the possible exception of some limited circumstances in which the prosecutor may view a guilty plea to a substantive count as being better from the government's point of view, the consistent practice of prosecutors in cases such as this is to insist on a guilty plea to the conspiracy count as the price for their agreeing to move to dismiss other substantive counts at sentencing. That is obviously what happened here. In short, nothing in the record here or in the real world of criminal law lessens the force of the "all or nothing" statement in the text of this concurrence.

were relevant—but it does not at all follow that he thereby acknowledged that *he himself* was in on it from the start.

Nothing said in *Savage* supports such a Hobson's choice for defendants, under which they are forced to go to trial (almost assuredly forfeiting any acceptance of responsibility credit) in order to be enabled to argue truthfully at sentencing that they were late entrants into a long-lasting conspiracy. Under the majority's analysis, someone who was first enlisted into a ten-year conspiracy to be the driver for a drug shipment that proved to be the final fatal one in which the authorities swept up the conspirators in a mass arrest, and who was then charged with everyone else in the same drug conspiracy count (as prosecutors regularly do, and have every right to do), somehow becomes a member of the conspiracy from day one by the act of pleading guilty. That cannot be the law, and it is not.

Nor is the majority aided by the string citation of other cases that are equally off point. Not one of the cited cases, each of which finds a very different aspect of waiver by reason of a guilty plea, supports the proposition announced by the majority opinion. And the absence of any language in judicial opinions rejecting that proposition surely reflects nothing more than the fact that no prosecutor (including the one in this case) has advanced it. This is the first and only case even to have suggested this result, so much at odds with the established principles of conspiracy law.

Last month the Court of Appeals for the Fourth Circuit did deal with the issue whether a defendant, by pleading guilty to the conspiracy count in a multi-defendant drug indictment, was thereby precluded as a matter of law. from contesting the *amount* of cocaine for which he was being held responsible (*United States v. Gilliam,*

987 F.2d 1009 (4th Cir.1993)). There the conspiracy count "listed the 28 participants and charged that the conspiracy involved distribution or possession with the intent to distribute 30 kilograms or more of cocaine" (*id.* at * 4). If the waiver concept that has been expressed in the majority opinion here were to prevail, clearly that charge posed a far more compelling case for the attribution to defendant Gilliam (who was not suggested to have been a conspirator for less than the full time span of the conspiracy) of the express amount specified in the indictment. By contrast, in the present case the indictment simply charges that 12 people engaged in a conspiracy that spanned an overall time frame—something that is not at all equivalent as a matter of law, for the reasons that I have already expressed, to charging that *each* co-conspirator was a participant in the conspiracy throughout the duration of that time span.

Writing for the *Gilliam* majority, Circuit Judge William Wilkins, Jr. (Chairman of the United States Sentencing Commission, which is vested by Congress with responsibility for the adoption and revision of the Guidelines) held defendant was *not* bound to that 30 kilogram figure by reason of his guilty plea. Not only does this case present an a fortiori situation calling for the same result of non-waiver, but I believe that the majority opinion here creates a conflict between circuits.[3]

What is of course most regrettable about the majority's shorthand treatment of the issue as one of waiver is that it is entirely needless to this case. There is more than enough in the record to support the factual findings by the district court as to Truman's *actual* 1986 involvement in the conspiracy, and as to the incredibility of Truman's disclaimer that he knew marijuana

3. Page 1500 of the majority opinion relegates *Gilliam* to footnote status, characterizing it as "factually distinguishable." That is true only in the tautological sense that *every* case is "factually distinguishable" from every other. What is significant in jurisprudential terms is whether the "distinction" is one with or without a difference in the legal sense. In this situation any factual distinction cuts the other way: If waiver

is inappropriate in the *Gilliam* context, it is doubly inappropriate here. Hence the cases are in collision. Indeed, because the situation in this case does not approach the one posed in *Gilliam,* I would suggest that the position stated by Circuit Judge Widener in dissenting from the majority opinion in *Gilliam* does not support the majority decision here. But even if it did, the inter-circuit conflict would still exist.

was involved at that time (see at 1501–02 n. 7). Those findings amply support an affirmance of the district court's ultimate finding that Truman in fact joined the conspiracy in 1986.

Apart from that point of disagreement with the waiver concept voiced by the majority opinion, I turn to another subject on which I also agree with the conclusion reached in that opinion, but as to which I hope that the perspective of a district judge might provide some added insight. Any full appreciation of the manner in which Sentencing Guideline § 3E1.1—the acceptance-of-responsibility Guideline—works is likely to be gained only from living with it as part of the task of sentencing criminal defendants on a regular basis. There is no question that in practice the present Guideline regularly impinges on (though it may not violate as a matter of constitutional right) a defendant's opportunity to exercise some of the rights that the Framers valued so highly that they built them into the Bill of Rights: the Fifth Amendment's privilege against self-incrimination (as to conduct outside of the scope of the guilty plea) and the Sixth Amendment's right to trial (the same Amendment's right to counsel is much less often implicated).

That is particularly true as to the emphasis on *timeliness* of the acceptance of responsibility reflected in Application Note 1(g) to Guideline § 3E1.1. Religion recognizes—even stresses—that repentance never comes too late for redemption. And even in the secular sphere that courts occupy, true remorse for having committed a crime is not necessarily inconsistent with an early, and even vigorous, insistence that the government bear the burden of establishing guilt beyond a reasonable doubt that has long been ingrained in our system.

Nor is that stress on timeliness justified by mere concern for the effects on a district court's calendar, often voiced in opinions from this court as an added reason to support a result on efficiency or cost-effectiveness grounds. District judges do much more than merely try lawsuits back to back. We do not function (for example) like the judges on the law calendar in the Circuit Court of Cook County, who do nothing but try cases that they receive from a central assignment calendar—cases with which they have no prior familiarity. For such judges, a day lost from trial is indeed a lost day. By contrast, for the district judge a respite from trial may well be both welcome and constructive—it gives the opportunity to deal other than at night or during odd snatched moments with the many complex motions that demand written treatment (primarily motions for summary judgment, less often motions to dismiss or other procedural motions), to say nothing of the opportunity to craft findings of fact and conclusions of law in cases that have been tried to the court and not to a jury. Solicitude for the workload of the overworked district court judiciary is welcome from any source, but any notion that the belated elimination of a case from the court's trial docket contributes to delays and to backlog really misperceives just what we do at the district court level.

But what has just been said here really goes to the wisdom (or lack of it) in the existing Guideline and Application Code, or to the manner in which the Guideline's reference to timeliness is often applied, not to the Guideline's validity as such. Most importantly in this case, the court's opinion accurately reflects that on the facts here neither of the Tolsons could fairly claim entitlement to the two-level reduction even on the most generous application of the concept of acceptance of responsibility.

To summarize what has been said here, if the judicial function were solely to be measured in terms of the results reached, I would have been pleased to join the majority without comment. But appellate courts announce opinions, rather than judgments alone, to guide other courts in the future. Some of what has been said in the majority opinion sets the law of this circuit on what I believe to be the wrong path. Accordingly I concur in the result reached by the majority, but not in the aspects of its opinion discussed here.