# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-1895

DAVID M. MURRELL,

*Petitioner-Appellant*,

*v.*

MATTHEW J. FRANK, Secretary,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99-C-0961—**Lynn Adelman**, *Judge.*

ARGUED NOVEMBER 13, 2002—DECIDED JUNE 23, 2003

Before COFFEY, POSNER, and MANION, *Circuit Judges.*

COFFEY, *Circuit Judge.* David Murrell was charged and convicted of committing five counts of reckless injury in connection with a shooting that took place on October 25, 1993, in a nightclub known as the Roxbury Club, located in the City of Milwaukee, Wisconsin. After a five-day trial, the jury found Murrell guilty on all counts. Murrell filed a post-conviction motion for a new trial, arguing that his attorney failed to provide him with effective assistance at trial. After conducting multiple hearings in the matter, the state trial judge denied Murrell's motion for a new trial based on his claim of ineffective assistance. The trial court's decision was affirmed by the Wisconsin Court of Appeals. The Wisconsin Supreme Court declined to ac-

cept the matter for review. Thereafter, Murrell launched a collateral attack on his conviction and the federal district court denied Murrell's request for habeas relief, finding that the Wisconsin Court of Appeals' decision could not be classified an unreasonable application of *Strickland*. We affirm.

## I. Factual Background

Around 1:00 a.m. on October 25, 1993, a shooting took place at the Roxbury Club (the "Club"), in which some five gun shots were fired, resulting in bodily injury (multiple gunshot wounds) to four of the Club's patrons: Orlando Williams, Mario Burrage, Randolph Harvey, and Shawn Bufford, as well as one of the Club's security guards, Eddie Murphy. A number of the victims were in serious condition when received at the hospital; all of them have since been discharged.

After an investigation, the State charged David Murrell and Carl Owens with five counts of reckless injury. Judge Diane Sykes, the trial judge[1], upon motion of defense counsel at the close of the prosecutors' case, dismissed the charge against Carl Owens based upon insufficient evidence. The case against Murrell continued and after completion of the five-day trial, the jury convicted Murrell on all counts.

## A. Trial Testimony

At trial, prosecutors presented a plethora of testimony and other evidence pinpointing Murrell as the perpetrator of the shootings resulting in the reckless injury crimes

---

[1] In 1999, Justice Sykes was elevated to the Wisconsin Supreme Court where she presently serves.

charged. Jermaine Burrage, whose brother was injured in the shooting, was an eyewitness to the event, and, consistent with a statement he gave police on the morning of the shooting, testified at trial that *he saw Murrell commit the crimes (reckless injury).* Specifically, Burrage recounted that, shortly before the shooting, he entered the men's bathroom and saw Murrell, who greeted him, stating, "What's up?"[2]. Soon thereafter, Owens entered the bathroom and told Murrell to "give him the strap because it's drama." (Day 3 Tr. at 117) (explaining that the word "strap" was slang for "gun" and the phrase "it's drama" meant that "something [was] going on like a fight or something.") Burrage testified that Murrell pulled an automatic pistol out from under his sweater, moved the slide in preparation for firing, and exited the bathroom with Owens, with the weapon in his (Murrell's) possession. Burrage followed Murrell and Owens out the bathroom door and, as Burrage was standing "behind [Murrell]," Burrage "saw [Murrell] fir[e] the gun . . . five or six [times]." (*Id.* at 120-22.)

After the shooting, Burrage waited with his brother until the "Flight For Life" helicopter ambulance arrived, and thereafter he proceeded on his own to the hospital where his brother was transported for emergency care. Police officers meanwhile began an investigation at the nightclub, and although Burrage was unable to give local au-

---

[2] According to the dissent, Jermaine Burrage "denied that he was a member [of a rival gang], while acknowledging that his friends were." Dissent at 40. The record reflects otherwise and establishes that Burrage never stated, much less admitted that *any* of his friends were in a gang. He did testify to the fact that some of his friends were referred to as the "One Way Boys," because, as he explained, "all of us [lived] on the one-way street" (Day 3 Tr. at 111); but it is less than accurate to state that he "acknowledged" that his friends belonged to a "rival gang."

thorities a detailed interview at the crime scene (because of his travel to the hospital to see his brother)[3], about seven hours later he contacted the Milwaukee police and informed them that it was Murrell who fired the weapon.

During trial, Christopher Davis, a security guard at the Roxbury, also provided testimony that proved damning to Murrell. Davis testified that, immediately prior to the shooting, he was standing inside near the entrance to the Club when an altercation broke out on the dance floor. He stated that, "approximately three seconds" after he had broken up the fight, he heard gunshots ring out behind him. Davis immediately exited the Club, positioned himself just outside the Club's front entrance and, while watching the entrance of the Club, observed Murrell walk out of the Club very casually, clutching on his right side what Davis "believed to be a weapon." (*Id.* at 271.) Davis remarked at trial that Murrell looked suspicious because as he exited the Club, he was walking in a manner that was far "too calm" for one who had just been in very close proximity to the scene of the shooting. (*Id.* at 226-27.)

Davis testified that, upon observing Murrell, he asked him to "stop," and Murrell "started running . . . [and] I chased behind him." (*Id.*) Davis's trial testimony as to what transpired during the footchase was as follows:

> "[Murrell] ran towards the [Club's] parking area, and he was running towards the parked cars. I asked him to stop again, and then at that point I saw him bring something out, and he shot it on the ground which was a gun, and he tried to toss it up under one of the cars there, but at that point I looked back to see

---

[3] Burrage stated that before he left the crime scene to be with his injured brother at the hospital, he told a person in uniform that he had seen Murrell fire the weapon (Day 3 Tr. at 178), but we have been unable to verify this in the record.

> if anyone else was around, and I saw Danny DeNeal—
> I believe that's his last name—and I screamed to him,
> 'hey, watch the gun,' and I continued to chase." (*Id.*)

Davis further remarked that he identified the object tossed, as a gun "when [it] hit the ground [and in that instant was able to see that it] was a black nine-millimeter . . . a Glock." (*Id.* at 228.) In fact, Davis stated that, while in pursuit of Murrell, he "actually ran over the gun," and at this time recognized the make of the gun because he (Davis) "carr[ies] a Glock [him]self" in connection with his duties as a security guard. (*Id.*) Davis went on to explain that, in an attempt to catch up with the suspect, he continued to chase Murrell through the Club's parking lot, across the street, and into a nearby parking lot (Northridge shopping center parking lot) "where he (Murrell) was then apprehended by [the] Milwaukee Police Department." (*Id.* at 229.) Thereafter, Davis returned with a police officer to the location where he "had previously seen [the gun] dropped" (*id.* at 23), and, within a minute or two, with Davis's assistance, the officer retrieved the Glock nine-millimeter that was later determined to have been used in the shooting. *See infra* at 7.

A number of police officers (Henson, Arndt, and Shaw) provided testimony consistent with Davis's account of his pursuit of the suspect. Officer Gregory Henson, a sergeant with the police department, testified that he was seated inside his squad car in the Northridge parking lot about 50 to 60 yards west of the Club's entrance, and while talking to an officer in another squad car (David Arndt), he heard the sound of four to five shots come from inside the Club. Sergeant Henson estimated that "[a]pproximately three to four seconds later [he] observed a uniformed security person chasing another male westbound from the entrance of the club into the parking lot . . .". (Day 4 Tr. at 40.) He further stated that the two people he observed running were later identified as

Davis and Murrell, and were the "first two people [he saw] leaving the area [of the Club]" (running through the Club's parking lot) after he (Henson) heard the five gun shots fired. (*Id.* at 52.)[4]

Officer Henson testified that, once Murrell was apprehended, Davis told "me that the subject he had been chasing had dropped a weapon almost immediately after he had left the club next to a vehicle parked in the [Club's] parking lot." (*Id.* at 43.) According to Officer Henson, "immediately" after the footchase (*id.* at 53), Davis led him back to the location in the parking lot where he had seen Murrell drop the gun and remarked, "this looks like the car that I ran between," at which time Sergeant Henson "spotted the weapon laying there on the ground" immediately next to the car. Davis then informed Henson "that [the gun lying there on the ground] was the gun that he saw [Murrell] drop (Glock nine-millimeter)." (*Id.* at 59-60.) After Murrell was taken into custody, Henson estimated that, with Davis's assistance, it took him but "[a] minute, minute and a half at most" to find the Glock nine-millimeter. (*Id.* at 53.)

---

[4] Davis and Murrell's footchase commenced just outside the entrance to the Roxbury Club, and continued westbound through the Club's parking lot, over a "service drive" (or street) and into another parking lot (Northridge shopping area lot) where Murrell was ultimately apprehended. (Day 4 Tr. at 13.) When Henson first observed Davis in pursuit of Murrell, the two men were "right where the first parking lot [the Club's parking lot] starts," and were located "closer to the Roxbury Club [than to the service] drive." (*Id.* at 46.) This testimony, which reveals that Henson observed Davis and Murrell early on in their footchase, is consistent with Henson's testimony that he observed Davis and Murrell (already engaged in a footchase) a mere "three to four" seconds after he heard gunshots fired from inside the Club. (*Id.* at 40.)

At trial, a forensic expert testified that the markings and indentations on the cartridge casings recovered at the scene of the shootings were consistent with the Glock nine-millimeter gun found lying on the ground immediately next to the car, and retrieved by Sergeant Henson with the assistance of Christopher Davis. The expert stated that all of the casings discharged during the shooting "[w]ere . . . from the [Glock] nine-millimeter handgun" recovered from the Club's parking lot. (Day 4 Tr. at 89.)

Officer David Arndt, who was seated in his own squad car next to Henson's squad car when the shots rang out, also testified that, after hearing the gunshots, he "went on broadcast . . . radio . . . and . . . advised other . . . tactical [police] units" of the incident. (*Id.* at 7.) Arndt stated that, after he accelerated his car out of its parked position, he noticed that people were running out of the Roxbury, and at that time had an opportunity to "observe[ ] . . . a uniformed individual [Davis] . . . chasing another black male [Murrell] . . . away from the club across the parking lot." (*Id.* at 8.) Officer Arndt drove toward these two individuals and apprehended the subject (Murrell) in the Northridge parking lot (the lot adjoining the Club's parking lot, *see supra* note 4). According to Arndt, as he placed Murrell in cuffs, Davis came upon the scene and, while acting "very excited," "stat[ed] this guy [Murrell] had . . . thr[own] his gun to the ground immediately after he exited the club." (*Id.* at 10.)

Leroy Shaw, a detective with the police department, took the stand and recounted an interview that he had conducted with Christopher Davis just two days after the shooting. Detective Shaw testified, as recorded in his interview report, that Davis had advised him that he had chased Murrell "*for some distance at which time he observed [Murrell] drop the gun from his pants.*" (Day 4 Tr. at 138) (emphasis added). Shaw also stated that, according to what Davis had told him during the interview, an-

other Roxbury Club security guard (Danny DeNeal) had yelled out to Davis, during the footchase, in an attempt to alert Davis to the fact that "he dropped a gun." (*Id.* 138.)

In further corroboration of Davis's testimony, Detective Shaw recounted that the Club's video tape (which was established to have been filming the scene during the incident) captured a "uniformed security guard" [Davis] running "out the door [immediately after the shooting inside the Club]." (*Id.* at 193) Detective Shaw also remarked that, after the security guard's exit, "*you can see [on the videotape] someone [Murrell] running out of the door clutching their right arm towards their side . . . .*" (*Id.* at 193-94) (emphasis added).[5] When the defense attorney asked Detective Shaw whether the man on the videotape exiting the Club clutching his right arm "[wa]s absolutely David Murrell," Detective Shaw responded: "Yes, that is David Murrell [on the videotape]." (*Id.* at 205.)

Murrell took the stand, in his own defense, and in an attempt to distance himself from the possession of the weapon and even more so from the firing thereof, testified that he was in the bathroom of the Roxbury Club, gambling (shooting dice), just prior to the shooting, and stated that Owens never entered the bathroom to ask him for a gun. Murrell also testified that on the night of the shooting he never had a weapon in his possession and that he left the bathroom on his own, to respond to a beeper message, and to try "to get out of the bathroom because I won this money and I wanted to . . . leave with it." (*Id.* at 29.) Murrell further stated that, as he was walking toward the

---

[5] Detective Shaw's testimony regarding the contents of the videotape, *i.e.*, his assertion that on the videotape "you can see someone running out of the [front] door clutching their right arm towards their side," (Day 4 Tr. at 193-94) was based on his own observations after viewing the videotape.

phone, he heard the shots ring out, and dropped to the ground.

Murrell did not see fit to comment on Davis's observation that he was acting "too calm" as he left the crime scene, nor did he say anything about the fact that he was observed to be clutching what the security guard "believed to be a gun." Murrell simply testified that he exited the Club attempting to get away from the scene of the shooting, and claimed that he was unaware of the fact that Davis was chasing him through the parking lot—in spite of the fact that Davis had *repeatedly* asked him to "stop." (*Id.* at 91) ("I didn't know the little dude (Davis) was chasing me.") Murrell alleged that, instead of running to get away *from* Davis, he was running in order to get *to* his car, which he claimed he had parked in the Northridge parking lot.

The jury, after hearing and weighing all of the testimony and evidence presented, and applying the judge's instructions to the facts, found beyond a reasonable doubt that Murrell was guilty as charged of all five counts of reckless injury set forth in the criminal information on file with the court.

## B.  Post-Conviction Motion for a New Trial

At a post-conviction hearing held on June 25, 1996, and presided over by the trial judge (Diane Sykes), Murrell alleged that his trial counsel's failure to present evidence of prior testimony given by Christopher Davis, failure to call Danny DeNeal and Briant Horton to testify, and failure to determine the exact number of his prior convictions prior to trial, amounted to ineffective assistance at trial.

### 1.  Davis's prior statement

In support of his post-conviction motion, Murrell submitted a transcript of Christopher Davis's testimony at his

(Murrell's) probation revocation hearing[6], held on February 10, 1994 (more than one year prior to Murrell's trial on the reckless injury charges). Despite the fact that Murrell submitted the transcript to support his theory that his trial counsel should have used the transcript to "impeach" Davis at trial, a reading of the transcript reveals that Davis's testimony at the revocation hearing is, in nearly every respect, best classified as uniformly consistent with his trial testimony (which, as far as Davis's credibility is concerned, is noteworthy considering the hearing and trial were held over a year apart and, each time, he was exposed to extensive and thorough direct and cross-examination). At both the probation revocation hearing and at trial, Davis testified that:

> (1) he was standing at the "front of the club near the entrance" when an altercation broke out (Day 3 Tr. at 215, RH Tr. at 37);
>
> (2) he attempted to break up a fight between "Buck" (Owens) and another person, (Day 3 Tr. at 223, RH Tr.

---

[6] Murrell submitted a transcript of Davis's prior testimony from the probation revocation hearing in lieu of Davis's direct testimony, for Davis was not subpoenaed to appear at the post-conviction hearing. Thus, Davis was never given an opportunity—as is the usual practice and custom in cases of impeachment by prior testimony—to refresh his recollection and read his prior testimony from the hearing held over a year prior to trial and to explain any inconsistency.

One wonders whether Murrell's counsel opted to present the transcript (rather than calling Davis to testify) in an attempt to nit pick the record for a possible inconsistency that Davis would have no opportunity to resolve. We have uncovered nothing in the record that explains why Davis himself was not called upon to testify at the post-conviction hearing, but we note in passing that, had Murrell truly sought to search for and uncover the truth, calling Davis as a witness would have been the more advisable course.

at 37), after which time shots rang out (Day 3 Tr. at 223, RH Tr. at 37);

(3) he exited the club, and noticed that a person exiting after him (later identified as Murrell) looked as if he was clutching his right side, and putting "what [Davis] thought was a firearm" (or, at trial, a "weapon") under his sweater (Day 3 Tr. at 226-27, RH Tr. at 37, 38 (noting it was his right side));

(4) Davis immediately became suspicious of Murrell, both because he (Murrell) appeared to be tucking a weapon under his sweater, and appeared to be "too calm" for the situation, considering a shooting had just taken place inside the Club (Day 3 Tr. at 227, RH Tr. at 46);

(5) his suspicions aroused, Davis asked Murrell to stop, but he (Murrell) took off running (Day 3 Tr. at 227, RH Tr. at 37);

(6) as Davis chased Murrell, he either saw Murrell drop the gun to the ground (Day 3 Tr. at 227) or, put in a slightly different (though not necessarily contradictory) way, saw the gun *on the ground* "right" where Murrell had "just passed." (RH Tr. at 40.)

The one difference between Davis's testimony at the probation revocation hearing and the testimony he presented during trial was that, rather than stating that he had seen the gun drop, he (Davis) testified that, as he was chasing Murrell, another security guard, Danny DeNeal, hollered, "he dropped the gun," which "made him aware" that Murrell had dropped the gun, and caused him to "look[ ] down," at which time he immediately observed "*[the Glock nine-millimeter] there on the ground, <u>right [where Murrell] had just passed</u>*. . . ." (*Id.*) (emphasis added).

## 2. *DeNeal's testimony at the post-conviction hearing*

In support of his post-conviction motion for a new trial, Murrell also theorized that his trial counsel was ineffective for failing to call to the stand Mr. Danny DeNeal, the witness with the ever-changing testimony. Because DeNeal at one point allegedly told a private investigator that he had seen *someone else* other than Murrell throw the gun down in the Roxy parking lot, in all likelihood, Murrell probably was hoping that DeNeal would give this similar account of the night's events at the post-conviction hearing. Instead, on this occasion, DeNeal came up with still another story and testified that, just after the shooting, he and "Davis . . . ran outside, and there was a Glock nine-millimeter laying under the car. . . The gun was already there when we ran outside. It was already laying on the ground." (PC Tr. at 62-63.)[7] When asked at the post-conviction hearing on direct examination whether he had "see[n] anybody throw down the gun in the parking lot," DeNeal replied, "No. . . The gun was already there when we ran outside. It was already lying on the ground." (*Id.* at 63.) During cross-examination, DeNeal also claimed (in spite of the fact that Davis and a number of officers had testified extensively regarding Davis's participation in the footchase) that he "never saw Davis chasing . . . Murrell" after the shooting. (*Id.* at 68.)

After DeNeal's testimony at the probation revocation hearing, Charles Haase, an investigator with the public defender's office, took the stand and it became clear that DeNeal had given Haase still another *entirely different* version of the night's events on a prior occasion. Investigator Haase recounted that on April 25, 1996 (about three

---

[7] Citations to the post-conviction hearing transcript are denoted "PC Tr.".

months prior to the post-conviction hearing, and approximately one year after the trial), he interviewed DeNeal. According to Haase, during this interview with DeNeal, DeNeal initially informed him that *he had not seen who dropped the gun on the ground*. Then, during the same questioning, DeNeal took an end-run around that statement and "*changed his story*" to reflect a statement he had previously given to police—*that he had seen the man who dropped the gun, and that the person was a bald, black male, around 5' 7"*, who was not Murrell. (RH Tr. 74-76.) DeNeal went on to *"elaborate" that the bald man whom he had allegedly seen drop the gun* had shortly thereafter driven by and pointed a shotgun at him (this new addition to the story was not even included in his prior statement to the police). (*Id.* at 77.) Also during the interview, DeNeal went further beyond all realms of truthfulness and further expanded his most recent version of the night's events and told Haase that he "remained with the gun, guarding it until Milwaukee Police arrived [to] tak[e] control of the evidence" (*Id.* at 75)—this is not recorded in any police report.[8]

Despite the fact that Haase's testimony highlighted DeNeal's tendency to repeatedly contradict himself, and to switch around and embellish the facts, Murrell presented Haase's testimony at the post-conviction hearing in support of his theory that the presentation of these statements (DeNeal) would likely have changed the outcome of his trial—but he failed to specify *which* version he would have used.

---

[8] We must note that, at Murrell's trial, not a single police officer at the crime scene testified that DeNeal was "standing guard" over the Glock nine-millimeter gun when it was found by Officer Henson in the Club's parking lot, immediately after the end of the footchase.

*3.   Briant Horton's testimony*

Along with the DeNeal theory, Murrell also complained that his attorney should have called the newly discovered mystery witness, Briant Horton, at trial. Mr. Horton, a self-described "associate" of Murrell, did not come forward with his account of the Roxbury Club incident until some five months *after* the night of the shooting. Moreover, at the time he disclosed his purported information regarding the shooting, Horton was an inmate in the Milwaukee County jail, confined in the same area of the jail as Mr. Murrell (and had been in personal contact with Murrell). We cannot tell from the nature of the questioning in the record, nor can we fathom or understand why Horton did not make known this purported information regarding his alleged witnessing of the shooting earlier, rather than some five months after the event, or, for that matter, why he suddenly had a change of mind and decided now to get involved at this late date. His explanation, if believable, was that although he initially did not want to get "involved . . . with the law," after he had "seen [Murrell] in jail and asked him what's going on, what you locked up for, and he told me [why he was in jail] . . . I told him, man, to tell your lawyer to contact me. I was there." (PC Tr. at 93.)

At the post-conviction hearing, Horton testified that, on the night of the shooting, he was in the dance hall, standing at a phone booth, when he saw Murrell exit the men's bathroom. Thereafter, according to Horton, shots rang out, and when "[he] first heard the shots," Horton hit the ground and "looked over at [Murrell]," who was lying on the ground next to him. (PC Tr. at 92.) Horton claimed that, while he was lying on the ground next to Murrell, he heard more shots, and was "able to see Murrell at that point" and Murrell "was [not] firing the shots." (PC Tr. at 94.)

Despite Murrell's claim to have informed his trial attorney, Ronald Hendree, about Horton's willingness to testify, when asked whether "Mr. Horton's name ever c[a]me up as a witness before [or] during the trial . . .," Hendree replied, "I don't remember Mr. Horton at all." (PC Tr. at 10.) On cross-examination, Hendree stated that if Murrell *had* given him Horton's name as a possible witness, Hendree "[woul]d [have] tr[ied] to contact" Horton as best he could, but cautioned that the people who were allegedly in Murrell's company on the night of the incident "are not people who you can pick up the phone book and just simply get their names."[9] (*Id.* at 30.) Hendree testified that he had used his "best efforts" to track down *all* of the names of witnesses that Murrell had provided him. (*Id.*) Thus, Attorney Hendree's testimony placed in grave doubt Murrell's claim to have informed Hendree about Briant Horton.

### 4. *Murrell's history of prior convictions*

In his post-conviction motion, Murrell also challenged his trial counsel's failure to determine the exact number of

---

[9] Additionally, if in fact Murrell did inform Hendree of Horton's willingness to testify, nothing in the record supports that he (Murrell) turned over one scintilla of information concerning Horton's address, phone number or other contact information (relatives' names, schools attended, etc.) to aid Mr. Hendree in his effort to contact the new mystery witness. Murrell (who maintained that he did discuss Horton's testimony with Hendree) stated at the post-conviction hearing that he told Hendree that the man's name was *Brian* Horton, rather than his actual name: *BRIANT* Horton. (PC Tr. at 104) ("He asked me what was [the witness's] name and I told him . . . Brian Horton.") If Hendree was not even given Briant Horton's correct name—much less a shred of additional possible contact information—it is difficult to understand how he could be expected to locate the newly discovered mysterious witness.

criminal convictions on his record before trial. The trial judge, in the absence of the jury, held a pre-trial hearing regarding Murrell's criminal record in an attempt to settle the question. Despite the fact that the court's "database" listed six convictions, Murrell testified—at the pre-trial hearing and at trial—that he only had *four* separate convictions: two counts of operating a vehicle without the owner's consent, one misdemeanor count for possession of a controlled substance, and one conviction for fleeing from a police officer[10]. When the parties were unable to reach an agreement or to stipulate to Murrell's prior record of criminal convictions, Murrell continued to "dispute the number[ ] of . . . conviction[s]" on his record at trial, maintaining that he had only four criminal convictions in his record.[11]

---

[10] Although the court's database listed two additional convictions—one count of escape and one battery conviction—Murrell claimed that neither of those convictions was actually on his record (although he did mention that he was "not all the way certain about the escape" charge (Day 5 Tr. at 17)).

[11] Under Wisconsin law, the State, on cross-examination or rebuttal, is permitted to inquire as to: (1) whether the defendant has ever been convicted of a crime; and (2) if so, how many times, *see, e.g.*, *Nicholas v. State of Wisconsin*, 183 N.W.2d 11, 14 (Wis. 1971), and if the defendant provides a less than accurate number of criminal convictions, the State may ask the nature and exact date of each of the criminal convictions. *Id.* at 15. In this case, Murrell's defense attorney initially questioned Murrell as to how many convictions were on his record on direct examination, at which time Murrell claimed he had previously been convicted of only four crimes. Anticipating that the State would cross-examine Murell as to the disputed number of convictions, Hendree went on to ask, "[a]nd there are two convictions that you dispute, right?", to which Hendree replied, "Yes . . . I'm not all the way certain about the escape . . . [b]ut I know about the battery by prisoner, that's not there." (Day 5 Tr. at 17.)

The parties subsequently discovered after trial that Murrell's battery conviction had been overturned (as he maintained) and thus he had been convicted of only five of the convictions listed on the court's database; *but they also determined that Murrell had been convicted of another crime <u>not</u> listed on the court's database*.[12] Murrell did in fact have *six* criminal convictions on his record rather than only the four that he admitted to at trial. Thus, if Murrell, during questioning by his own attorney, had admitted having *six* convictions on his record, he would not have been subject to cross-examination on the nature of his prior record of convictions (including the battery count).

## II. Analysis

### A. Standard of Review of Murrell's Ineffective Assistance Claim

Murrell claims that he was denied effective assistance of counsel under the Sixth Amendment. To prevail on his ineffective assistance claim, Murrell must demonstrate that: (1) his counsel's performance fell below an objective standard of reasonableness, and (2) caused him prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In order to satisfy the prejudice requirement, Murrell must establish that "*there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different*." *Id.* at 694 (emphasis added).

---

[12] After testifying at trial that he had only *four* convictions in his record, Murrell conceded *after trial*, in his post-conviction motion, that he now (for the first time) owned up to the fact that "he had *at least* six prior convictions [on his record] for impeachment purposes." *State of Wisconsin v. Murrell*, No. F-934492 at 10-11 (Milw. Cir. Ct. May 30, 1997).

Our review of the state court's adjudication of Murrell's ineffective assistance claim is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254). Under the AEDPA, a state prisoner who petitions for a writ of habeas corpus must establish that the state court adjudication of his case was "*contrary to, or involved an unreasonable application of, clearly-established Federal law, as determined by the Supreme Court of the United States.*" 28 U.S.C. § 2254(d)(1) (emphasis added). It is clear from the record before us, and our review of the law, that the Wisconsin Court of Appeals properly identified and applied *Strickland* as the proper legal standard governing Murrell's ineffective assistance claim. Thus, <u>unless we can hold that the state appellate court "unreasonably applie[d] [the Strickland standard] to the facts of the case," we are without authority to grant Murrell's petition for habeas relief.</u> *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 1850 (2002) (emphasis added).

The bar for establishing that a state court's application of the *Strickland* standard was "unreasonable" is a high one: we have stated on prior occasion that "'*only a clear error* in applying *Strickland* would support a writ of habeas corpus,'" *Dixon v. Snyder*, 266 F.3d 693, 700-01 (7th Cir. 2001) (quoting *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997)), because "*Strickland* calls for inquiry into degrees," thereby "add[ing] a layer of respect for a state court's application of the legal standard." *Whitehead v. Cowan*, 263 F.3d 708, 731 (7th Cir. 2001) (emphasis added). Accordingly, this Court *is obligated to affirm the district court's decision to deny the writ, so long as the Wisconsin Court of Appeals "t[ook] the [constitutional standard] seriously and produce[d] an answer within the range of defensible positions.*" *Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir. 2000) (emphasis added).

Additionally, in reviewing the state trial and appellate courts' adjudication of an ineffective assistance claim, we MUST *presume that all factual determinations made by the state courts, including credibility determinations, are correct, unless rebutted by clear and convincing evidence. See Collier v. Davis*, 301 F.3d 843, 848 (7th Cir. 2002) ("we presume [a state court's factual] determination to be correct unless [it is] rebut[ted] . . . with clear and convincing evidence to the contrary"); 28 U.S.C. § 2254(e)(1). This stands to reason, in light of the long-held principle of jurisprudence that "*the trial judge is in the best position to judge the credibility of witnesses . . .,*" *United States v. Woods*, 233 F.3d 482, 484 (7th Cir. 2000) (emphasis added), when indeed, the "*[trial judge] has . . . the best 'opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.*" *Id.* (emphasis in original) (quoting *United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir. 1993)). "We extend great deference to [trial courts' credibility determinations] because . . . [such deference] is mandated by Congress" under the AEDPA, *Tolson*, 988 F.2d at 1497 (discussing this Court's deference to a trial judge's determination of acceptance of responsibility in the sentencing context, based on the same jurisprudential principle that the sentencing judge is in a "unique position" to evaluate witness credibility). *See Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997) (outlining the AEDPA's "presumption of correctness" of state-court factual findings, and emphasizing the Act's "highly deferential standard" for evaluating state-court rulings on collateral review).

As we have previously remarked, the "criterion for assessing the *reasonableness of a state court's application*

*of Supreme Court case law*, pursuant to § 2254(d)(1), is whether the determination is at least minimally consistent with the facts and circumstances of the case." *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999) (internal quotation marks and citation omitted, emphasis added). In this case, after conducting our review of the record, transcripts and state trial and appellate courts' orders and opinions, we are convinced that the state courts' adjudication of Murrell's claim was not only "minimally consistent" with the facts in this case, but indeed was *wholly supported* by the plethora of damning evidence presented against Murrell.

## B.  Davis's Alleged Prior Inconsistent Testimony

Murrell, in spite of the overwhelming evidence of his guilt, contends that there is a reasonable likelihood that, if his counsel had presented during trial Davis's testimony from the probation revocation hearing (more than one year prior to date of trial), as he did at the post-conviction hearing, the outcome would have been different. Murrell's two-fold argument is that Davis's prior testimony from the probation revocation hearing—which differed from his trial testimony only as to *the exact split second* when Davis saw the gun ((1) as it left Murrell's hand and fell to the ground or (2) just after it hit the ground)—would have: "impugned his general integrity" at trial and directly challenged the "most important part of his trial testimony," Appellant's Br. at 24, namely, the link between Murrell and the Glock nine-millimeter gun used in the shooting. We disagree.

### 1.  Davis's "general integrity"

Murrell claims that Davis's prior testimony at the probation revocation hearing concerning the footchase

would have impugned Davis's "general integrity"; we disagree for it would have at most put in question *but one single point* in Davis's 63 pages of trial testimony, namely, his statement that, as he pursued Murrell during the footchase, he in fact "saw him bring something out, and he shot it on the ground which was a gun." (Tr. at 227.)

A comparison of the probation revocation hearing and trial transcripts reveals that *the only discrepancy between Davis's description of the shooting and subsequent footchase at trial and his prior description of the event at the probation revocation hearing was regarding his split-second observation of Murrell's gun—whether he saw the gun just before it hit the pavement as it left Murrell's hand, or immediately after it fell to the ground. See supra* at 10-11. When taken in the context of his overall testimony, this single reference to an alleged inconsistency between his trial testimony and prior probation revocation hearing testimony as to this split second in time is more accurately described as a difference that is but a matter of degree rather than a difference in kind. After all, Davis's prior testimony that he "couldn't say that he actually saw [Murrell] drop it," (PR Tr. at 40), must be read in conjunction with all of his other statements concerning the gun (possibly more than ten in number)—from the period in the time sequence when he had seen Murrell clutching what he "believed" was a gun, to the instant during the footchase that another security guard (DeNeal) "made him aware" that Murrell had dropped a gun, and at which point he looked down and saw the gun *right* at the spot that Murrell had just passed.[13] Reading Davis's probation

---

[13] Additionally, we note that even at trial, Davis testified that he did not identify the falling object as a gun until "[the second that] it hit the ground." (Day 3 Tr. at 228.) In that sense, his trial testimony regarding the timing of his identification of the

(continued...)

revocation hearing testimony in its entirety, this prior statement was substantially the same as his claim to have actually "seen" the gun as it hit the ground (as Davis stated at trial).[14] And regardless whether he saw the gun at the split second it left Murrell's hand, or the fraction of a second when it hit or just after it hit the ground, the gun Davis saw during the footchase was later positively identified by forensic experts, after thorough testing, photographing and examining, as the Glock nine-millimeter gun used in the shootings. *See supra* at 7.

It is important to note that it was amply clear, based on Davis's excited utterances to police officers just after

---

[13] (...continued)
gun was *consistent* with his statement at the probation hearing that it was not until he "looked down" that he saw the gun "there on the ground, right" where Murrell had just been running. (PR Tr. at 40.)

[14] Notably, Davis had, on other previous occasions (even before giving his testimony at the probation revocation hearing), stated, *as he did at trial*, that he had seen Murrell drop the gun. As Detective Shaw testified at trial, in an interview of Davis, conducted two days after the shooting, Davis had stated that he had chased Murrell "for some distance *at which time he [Davis] observed the man [Murrell] drop the gun . . . .*" (Tr. at 138) (emphasis added). Thus, it is evident that Davis, in repeatedly (and exhaustively) recounting the night's events during interviews and proceedings after the shooting, at certain times, described having "seen" the gun drop, while at other times, described having been "made aware" that the gun had dropped just before seeing the gun "right" in Murrell's path—reflecting that the events including the footchase and the dispensing of the gun happened so quickly that pinning down the exact moment of the observation (of the gun) during repeated examination and interrogation was at best somewhat difficult for Davis, as it would have been for anyone. This is at worst but a minor inconsistency, and certainly far removed from a sign of general incredibility.

the firing of the gun and the footchase, as well as the testimony he recited—time and time again—regarding the circumstances of the footchase, that the combined events surrounding the shooting led Davis to form the logical and reasonable belief that Murrell was in possession of the gun as he left the Club, and that Murrell *had* dropped a Glock nine-millimeter during the footchase. (*See, e.g.*, Day 4 Tr. at 10) (Officer Arndt's testimony recounting that after Murrell was apprehended, Davis was very "excited," and told him that Murrell had "thr[own] his gun to the ground" after exiting the club).

It is also certainly very understandable for Davis, having seen a Glock nine-millimeter gun "right" in Murrell's immediate path, having heard someone holler, "he dropped it," and having observed *no one else* in the area (other than Murrell), to have properly and logically reaffirmed his belief that the subject he was chasing "had dropped" the gun. (*Id.* at 43.) It is equally understandable that Davis, in his excitement, stated to a police officer, immediately after the incident, that, while he was in hot pursuit of Murrell with his eyes focused on the fleeing suspect, he had "seen" the gun drop, as he very well may have. (*Id.* at 60) (Henson's testimony that, with Davis's help, he was able to locate the Glock gun in a "minute" or "minute and a half at most" and that Davis "indicated . . . that [the Glock nine-millimeter located in the Club's parking lot] was the gun that he *saw the person he was chasing drop*.") Indeed, according to Officer Henson's observation, Davis and Murrell were *the first two people to "leav[e] the area of the club" after the shooting.*[15] It is nigh unto impos-

---

[15] Specifically, Henson stated that, as soon as he heard the gunshots, his "attention [was] drawn toward the door of the Roxbury," at which time he saw Davis chasing Murrell through the parking lot. (Day 4 Tr. at 51-52.) As Henson witnessed the

(continued...)

sible, under these circumstances, that the Glock nine-millimeter identified by forensic experts as having been the gun used in the shooting was thrown in the path of Davis and Murrell's footrace by any person *other than Murrell*. (*Id.* at 51-52.)

Finally, prosecutors presented corroborating evidence supporting Davis's claim and testimony that he was in continuous hot pursuit of Murrell from the time he left the Club immediately after the shooting and that, during that time, he saw Murrell drop the gun. *See supra* at 5-8. Davis's initial recollection of Murrell's exit from the Club (clutching something under his arm at right side) was bolstered by Detective Shaw's testimony that the Club's videotape captured a "uniformed security guard" (Davis) running "out the door [immediately after the shooting inside the club]," as well as another individual who shortly thereafter exited the Club "clutching their *right arm towards their side*." (*Id.* at 193-94.)[16] *See supra* at 8.

---

[15] (...continued)
footchase—a mere "three to four seconds" after the shooting (*id.* at 40)—he noted that Davis and Murrell were the "*first two people [he saw] leaving the area [of the Club]*." (*Id.* at 52) (emphasis added).

[16] The dissent claims that the state appellate court "was mistaken" about the record when it stated that "another officer identified Murrell as the man on the video leaving the club clutching his side." Dissent at 44. We disagree. At trial, Detective Shaw was asked, "[C]an [you] sit and tell this jury that that is absolutely David Murrell [exiting the Club on the videotape]?", and Shaw replied, "*Yes, that is David Murrell*." (Day 4 Tr. at 205) (emphasis added).

Moreover, there is no reason to believe that, as the dissent speculates, if "Davis had been impeached" by the single alleged inconsistency from his testimony at the revocation hearing, the
(continued...)

Officers Arndt and Henson verified that they saw a uniformed black male chase another black male through the parking lot outside the Club straight into the path of Arndt's squad car, where the individual, Murrell, was apprehended. (*Id.* at 8) (*See also* Day 4 Tr. at 40.) And Officer Henson confirmed that, after Murrell was taken into custody, the witness (Davis) was immediately *"able to show [Henson] the area where the weapon had been dropped"* and that Henson almost immediately *"did locate a weapon [there]"* (Glock nine-millimeter) (*Id.* at 43, 53) (emphasis added). *See supra* at 6 (same gun identified by forensic experts as the weapon used in the shooting).

A reading of Davis's trial testimony in its entirety makes it more obvious that any variance was very minimal at best from his prior testimony at the probation revocation hearing (more than one year before trial).

---

[16] (...continued)
value of the videotape (or Shaw's description thereof) would have "unraveled." Dissent at 44. It is one thing to speculate; it is something else to establish a different position based upon the information contained in the record before us. And as we have discussed, Davis's trial testimony *would not* have been generally discredited by *one single alleged inconsistency* contained in his 63 pages of trial testimony and 14 pages of revocation hearing testimony, because, when reviewing the totality of the record testimony, his trial testimony was entirely consistent with his prior testimony on all other points. In any case, it is uncontroverted (even Murrell himself admitted as much) that the videotape *did* display a picture of a security guard exiting the Club immediately after the shooting (as Davis testified), followed closely by a man exiting the Club while clutching his right side (Davis's testimony). (Day 5 Tr. at 53.) Since the videotape *did* reflect *exactly* what Davis repeatedly testified (during exhaustive cross-examination) that he had personally observed as Murrell exited the Club, the only conclusion one could draw is that the videotape would have *bolstered* Davis's credibility.

Because Davis's account of the incident was further corroborated with the statements of Officers Henson, Arndt and Shaw, we are convinced that Davis would have remained a most credible witness, even if his prior testimony from the probation hearing had been presented.

### 2. *Linking Murrell to the gun*

Having established that Davis's prior testimony would not have affected his credibility, we turn now to the question of whether, as Murrell claims, introducing Davis's prior testimony that he had not in fact seen the gun drop would have "challenged the accuracy of the most important part of [Davis's] trial testimony." Appellant's Br. at 24. Murrell speculates that, if Davis had been challenged on his claim to have "seen" the gun drop, there is a reasonable probability that the outcome of the trial would have been different. But the single statement that Murrell attacks—regarding a split second time differential in Murrell's observation of the gun—was but a segment of one minute of what was, overall, a detailed, clear and convincing recitation of the facts, given by Davis, corroborated by other law enforcement officers and proven beyond a reasonable doubt to the satisfaction of the jury. And unfortunately for Murrell, *even without* Davis's statement at trial that he in fact "saw" Murrell drop the gun, Davis's clear, unequivocal and convincing testimony regarding Murrell's behavior just after the shooting, and his discovery of the gun "right" in Murrell's path of flight, combined with the corroborating testimony of other witnesses (Burrage, Arndt, Henson, forensic expert), as well as the videotape (Shaw), presented *more than ample* evidence to the jury and trial judge establishing that Murrell was in possession of and used the Glock nine-millimeter weapon to perpetrate the shootings at the Roxbury Club.

Notably, the State presented *eyewitness testimony* that Murrell committed the crimes charged. As recounted above, Burrage testified—consistent with a statement given to police the morning of the shooting—that while he was in the men's bathroom just prior to the shooting, he saw Murrell pull out a Glock nine-millimeter gun and work the slide in preparation for firing it. Burrage's testimony provided a "motive" for the shooting—namely, that Murrell had been informed by his friend (Owens) that there was a fight going on, and that Murrell was needed to attend to the situation by "getting out the strap" (the gun). Burrage also recounted that, after he followed Murrell and Owens out of the bathroom, he personally witnessed Murrell fire five or six shots into the crowd.[17]

---

[17] Burrage's eyewitness testimony was a potent weapon for the state. And although the dissent goes to great lengths in an attempt to disparage Burrage, a number of the dissent's criticisms are less than accurate, much less convincing. The dissent somehow claims that Burrage "contradicted himself" with respect to the "size of the gun," "what hand Murrell held it in," and even "who else was in the bathroom," but these assertions fall far short of reciting the complete, unedited story.

To set the record straight, Burrage *never did* contradict himself as to the size of the handgun. It is true that in his first conversation with Detective Shaw, Burrage described the Glock nine-millimeter as a "small black handgun." But this is not a "contradiction," as the dissent's criticism would imply, for what qualifies as a "small" or "large" gun is a subjective determination that may vary significantly from person to person. We must also note that Burrage's description of the gun as a "small black handgun" was given during an abbreviated *five-minute telephone call* that was "cut short" so that Burrage could "go[ ] back to the hospital" to see his seriously injured brother. (Day 4 Tr. at 183.) Made during a period of extreme stress, Burrage's initial statement was hurried and, quite understandably, less than polished. The very next day, in a more calm, lengthy and

(continued...)

[17] (...continued)
detailed in-person interview with Detective Shaw, Burrage was "able to go into the events in more detail," (Day 4 Tr. at 184), and at that time *specifically identified the gun he had seen Murrell use as a Glock nine-millimeter*. (*Id.* Tr. at 162.)

Also, let us make clear that although Burrage stated during the first (five-minute) interview that Murrell held the gun in his left hand, during the full-length interview (next day), when Officer Shaw asked him to demonstrate how Murrell had held the gun, Burrage did so by "[holding] [the gun] in his right hand and then cock[ing] it with his left hand . . .." (*Id.* at 185) (emphasis added). Thus, when Burrage was given the opportunity to further explain how Murrell handled the gun, he described it exactly as he did at trial—placing the gun in Murrell's *right* hand (while showing that it was *cocked* with his left hand). And in any case, it is not hard to understand that Burrage's initial description of the event was somewhat different given that he was at that particular time under a state of extreme stress, in as much as his brother, earlier that morning, had been shot and conveyed to the hospital in a "Flight for Life" helicopter.

The dissent's statement that Burrage "contradicted" himself with respect to "who else was in the bathroom" is also potentially misleading. Reading that definitive statement, one might erroneously conclude that Burrage stated on different occasions that different people were in the bathroom with him and Murrell. That clearly is not the case. Burrage *consistently* stated that he did not know the identity of the person or persons whom he observed in the bathroom during the one or two moments he spent in the bathroom prior to the shooting. At a preliminary hearing, he stated that when he entered the bathroom that night, he saw Murrell and "someone who [he] didn't know" (Day 3 Tr. at 136), while at trial he said that in addition to Murrell, he saw "*a group of people that [he] didn't know*." (*Id.* at 114) (emphasis added). In characterizing this as a "contradiction," the dissent assumes that Burrage uses the King's English or perfect grammar, but it is wrong to assume that he would never use the word "someone" to refer to *multiple people* whom he didn't know. These

(continued...)

Even excluding Davis's single alleged inconsistent statement, his testimony linked Murrell to the Glock nine-millimeter gun used in the shooting. As we have already explained, Davis noticed that as Murrell exited the Club he was acting "very suspicious" because he appeared to be "too calm" considering what he had just witnessed, and that (as supported by the Club's videotape) he was tucking into his pants something that Davis "could have sworn was a gun." Furthermore, Davis testified that Murrell refused to stop when Davis asked him to, and at that time took off at an accelerated pace. According to Davis, he either saw the gun drop (trial) or was "made aware" of the gun drop when he saw the Glock nine-millimeter on the ground (and, indeed, he "stepped right over" the gun) "right" at the place that Murrell had just passed (revocation hearing). In any case, Davis's observation of the Glock nine-millimeter gun—"right" in Murrell's path—helped confirm his prior suspicion that Murrell was the shooter ("too calm," tucking what he thought

---

[17] (...continued) witnesses were neither English professors nor scholars, and as a review of Burrage's testimony reveals, (*see, e.g.*, *id.* at 140 ("He *weren't* . . ."); *id.* at 151 ("I *weren't* . . .") (emphasis added)), we may not be able to assume the use of proper grammar in this case.

Finally, we note also that the dissent's statement that "Burrage was an enemy" of Murrell, Dissent at 46, is an inaccurate portrayal of the record evidence. Indeed, Murrell himself painted a different picture of his relationship to Burrage, testifying at trial that he could not think of "an honest reason why" Burrage might lie about his (Murrell's) involvement in the shooting. (Day 5 Tr. at 93.) Was Burrage an enemy of Murrell? According to the dissent, maybe, but not according to Murrell's own statement— given under oath—that "*to the best of [his (Murrell's)] knowledge the little differences [he] and [Burrage] had were all resolved.*" (*Id.*) (emphasis added).

was a gun into his pants, and under his sweater at the
beltline) and that he was trying to discard the weapon in
an attempt to do away with the most incriminating
evidence—the gun used in the shootings.[18]

Moreover, as discussed above, Officer Henson's trial
testimony, as well as Davis's probation hearing testimony[19],
established that *there was no other person in the Club's
parking lot immediately after the shooting* (the time frame
when Davis observed the Glock nine-millimeter "right" in
the immediate vicinity where Murrell had just passed). *See
supra* note 15 and accompanying text (discussing Hen-
son's observations of the footchase). In the absence of
any other persons in the area, it is *most* unlikely that
anyone *but* Murrell could have dropped the gun in the
parking lot.

"Circumstantial evidence is of equal probative value to
direct evidence and in some cases is even more reliable."

---

[18] At trial, on cross-examination, Davis testified that a Roxbury
employee (DeNeal, standing at the entrance of the club) had yelled
out during the chase, "He dropped the gun." (Day 3 Tr. at 249.)
This statement may very well have alerted Davis to the confirma-
tion of his prior belief that he had earlier observed Murrell
clutching a weapon under his clothing at the belt line on his
right side, and shortly thereafter Davis "looked down and
observed the dark handgun lying in the parking lot," (*Id.* at 249),
right where Murrell had just passed.

[19] Similar to Officer Henson's testimony, Davis testified at the
probation revocation hearing that Murrell was the only other
person in the area of the parking lot at the time of the footchase
(other than himself, still in hot pursuit of Murrell). (RH TR. at 40)
(The ALJ presiding over the probation revocation hearing stated
to Davis: "The question was, was there anyone else with Mr.
Murrell or in that [parking lot] area [after the shooting] . . . ?"
Davis, under oath, replied: "You're saying with [Murrell]?
*No, there was no one else with him that I could see in that area,
no*.")

*United States v. Reyes*, 270 F.3d 1158, 1169 (7th Cir. 2001) (internal citations omitted). In this case, prosecutors presented *both* circumstantial *and* direct evidence of Murrell's guilt, and one would be hard-pressed, in the face of this wealth of overwhelming evidence of Murrell's guilt, to find that there is a reasonable probability that Davis's previous testimony regarding the dropping of the gun would have resulted in a different outcome at trial. *See Strickland*, 466 U.S. at 694 (1984) (to demonstrate prejudice, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different). After reviewing the record, the Wisconsin Court of Appeals did not find that there was such a reasonable probability; nor do we upon federal appellate review. We are convinced that, in light of the totality of the consistent and damaging testimony that Davis presented (both at the probation revocation hearing and at trial), the statements of the police officers, as well as the eyewitness testimony of Jermaine Burrage, the state court's decision was both reasonable and proper.

## C. *DeNeal's Testimony*

Neither was counsel's trial decision not to present Danny DeNeal's testimony prejudicial. Although DeNeal testified at the post-conviction hearing that he saw a gun on the ground immediately after he exited the club after the shooting (thus contradicting Davis's claim at trial that Murrell did not discard the gun until after he took off on a footrace), DeNeal's credibility had significantly diminished by that point, for he had changed his account of the incident some *three times.* Because DeNeal's testimony at the post-conviction hearing—on almost every single point—was *entirely* inconsistent with the statement he (DeNeal) had given Investigator Haase on a prior occasion,

we have no trouble agreeing with the dissent's assessment that DeNeal was a "thoroughly unreliable witness." Dissent at 46.

At the post-conviction hearing, DeNeal testified, contrary to one of his prior statements he had given police, that: (1) he did *not* see anyone throw the gun to the ground, and (2) furthermore that the gun was already on the ground at the time that he exited the club. This version of events was dramatically different from the other story he had told Investigator Haase—*i.e.*, that he saw a short, bald African-American man (not Murrell) drop the gun in the parking lot. We cannot imagine that a defense attorney worth his salt would present a witness who had attested to three different versions of the night's events—what a feast for the prosecuting attorney on cross examination. Indeed, given DeNeal's penchant for switching, changing and altering stories to fit the need, who knows what sort of new thread of fabrication DeNeal would have manufactured had he been called to testify once again?

In any case, DeNeal's claim that he happened to see the Glock nine-millimeter already on the ground, after he exited the Club after the shooting, was incredible under the circumstances, given that the gun was *not* recovered by the police officer right outside the Club, but rather in a parking lot immediately West of the Club—some distance away (at least fifty feet) from the entrance to the Club (right where the weapon was observed by Davis during the footchase). (Tr. at 48.) It is most unlikely that, in the pitch black of night, DeNeal would have been able to see a black gun lying on the parking lot pavement some fifty feet from the entrance of the Club.[20]

---

[20] It is also clear that other statements made by DeNeal were similarly unbelievable. For example, although DeNeal claimed

(continued...)

Moreover, even if Murrell's counsel had presented DeNeal's prior statement to Investigator Haase, by way of impeachment, that he had seen a bald, African-American male (not Murrell) drop the gun, and if counsel had also presented by impeachment Davis's prior revocation hearing testimony, there is still no reasonable probability that the outcome of the trial would have been different. After all, the dissent even admits that DeNeal was a "thoroughly unreliable witness." Dissent at 46. And furthermore, if DeNeal could not be trusted to tell the truth, when he was under oath, we fail to see how any report he gave outside the confines of the courtroom witness chair, when not under the penalty of perjury, would have been accepted by the jury or would have otherwise changed the outcome of the trial—particularly in light of the lack of evidence corroborating the statement and the number of times he changed his story (at least three).[21] Given the

---

[20] (...continued)

to have exited the Club with Davis after the shooting, he *denied having seen Davis chase after anyone subsequent to leaving the Club*. (PC Tr. at 64) ("After you ran out of the club with Mr. Davis, did you happen to see Mr. Davis chase Mr. Murrell?" "No, I didn't.") That DeNeal could have exited the Club with Davis and not noticed Davis chasing Murrell across parking lots until Murrell's eventual apprehension was most unlikely and thus incredible. It is not surprising that the trial judge, who witnessed DeNeal's newly created testimony and had the best opportunity to observe his demeanor and mannerisms on the stand, concluded that failing to present DeNeal's testimony was not trial counsel error—indeed, in light of the unreliability of DeNeal's testimony (changed his story _three times_), it is difficult to ascertain how DeNeal would have helped Murrell's case at all.

[21] We note that the dissent's attempt to bolster DeNeal's credibility by remarking that he was "[not] a friend of Murrell's," Dissent

(continued...)

unbelievability of DeNeal's in-court testimony, it is *quite* unlikely that *anything* he said could, or much less *would* have affected the outcome of the trial.[22] DeNeal was

---

[21] (...continued)
at 45, and by attempting to link him to Davis because "both were members of the nightclub's security staff," *id.*, must ultimately fail. On what basis in the record are we to assume that just because DeNeal was not Murrell's friend he had no "motive to lie to protect him"? *Id.* Indeed, the very fact that DeNeal changed his story several times in such dramatic fashion appears to support the theory that he *most definitely did* have an underlying motive to lie (though we do not know what it was).

And, as far as DeNeal's relationship to Davis is concerned, we emphasize that co-workers can have different motivations, and that the fact that DeNeal worked with Davis did *not* mean that DeNeal's trustworthiness was comparable to that of Davis. The proof is in the pudding, as they say, and despite the fact that Davis and DeNeal were both apparently outside the Club after the shooting, *Davis* was the one who: (1) took the initiative to take up the chase after the suspect, (2) according to the record, repeatedly gave the same story *time and time again* that Murrell was acting suspiciously, stuffing what Davis believed was a gun under his sweater on his right side at his beltline, and refusing to "stop", (3) observed a Glock nine-millimeter "right" in Murrell's path, and (4) assisted Officer Henson in finding the gun at the exact spot where he observed it during the footchase.

DeNeal, by contrast, gave entirely different versions of the night's events (not one of which was corroborated by testimony from other sources). Thus, for whatever reason, it is clear that DeNeal could not to be trusted to give a true and accurate recitation of the facts.

[22] Contrary to the dissent's assertion, DeNeal's incredibility was of little consequence insofar as the testimony of Christopher Davis was concerned. Sure, Davis testified at the probation revocation hearing that DeNeal had yelled "he dropped it, he dropped it." But Davis's account of the footchase did not rise and

(continued...)

simply incredible. Thus, the Wisconsin Court of Appeals' conclusion that DeNeal's testimony would not have altered the outcome of the trial was both reasonable and proper.

## D.  Briant Horton's Testimony

The omission of Briant Horton's testimony was similarly without prejudicial effect, because, although Horton made a last-minute claim to have been with Murrell during the incident, and to have observed Murrell fall to the ground at the time of the shooting—without a gun in his hands— we are convinced that the jury would not have accepted his statement. After all, the trial judge, whose factual determinations we must presume to be correct, 28 U.S.C. § 2254(e)(1), made a specific finding that Horton's "testi-mony *[wa]s not credible*" and furthermore was "not enough" to undermine the strength of the eyewitness testimony given by Davis and Burrage. *Wisconsin v. Murrell*, No.

---

[22] (...continued)

fall on DeNeal's "say-so." After all, Davis witnessed first-hand Murrell's suspicious behavior ("too calm," shoving what Davis thought was a gun under his sweater) just after the shooting. And Davis himself saw the Glock nine-millimeter "right" at the spot Murrell had just passed—in fact, Davis stated that he "ran right over" the gun. Finally, Davis himself proved that earlier his observations and sensory perceptions were accurate (that he *had* seen Murrell tucking a gun into his pants and under his sweater at the beltline, and that the Glock nine-millimeter that he had seen "right" in Murrell's path *was* the gun used in the shooting) for immediately after the footrace ended, Davis was able to point out to the authorities the location of the Glock nine-millimeter he had observed and, thereafter, forensic ex-perts determined that the Glock nine-millimeter he had found "right" in Murrell's path *was the very same weapon used inside the Club that night. See supra* at 7.

F-934492, at 15 (Wis. Cir. Ct. May 30, 1997) (emphasis added).

Indeed, Horton, the mystery witness, and the self-proclaimed "associate" of Murrell, did not come forward with his information until *more than five months* after the incident and, by that time, had an opportunity to confer with Murrell while both were confined in the *same area of the jail*. *See supra* at 14. It is all too convenient for Murrell that one of his "associates," with whom he was confined, somehow surprisingly claimed to have evidence regarding the shooting that was exculpatory to Murrell.

"We have frequently held that the trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony . . .," *United States v. Pitz*, 2 F.3d 723, 727-28 (7th Cir. 1993), insofar as the trial judge is in the best position to observe first-hand the testimony and behavior of the witnesses. *See supra* at 19. Thus, in the habeas corpus context, we cannot upset a factual finding of credibility by the state trial judge, without running afoul of applicable law. *See Mendiola*, 224 F.3d at 592 (discussing applicability of 28 U.S.C. § 2241(e)(1) to state court credibility determinations). Deferring, as we stated earlier we must, to the state court's finding that Horton was "not credible," we believe that the state appellate court's holding that the failure to call Horton was not prejudicial was entirely reasonable.

### E.  *Criminal Conviction History*

Lastly, even if it were somehow true that trial counsel's failure to investigate Murrell's criminal history was deficient performance, as appellate counsel alleges, it was not prejudicial. Even if counsel had jumped through every hoop that Murrell's appellate counsel, a veritable "Monday morning quarterback," would now have him do, Murrell still would have had to admit to five prior crim-

inal convictions—rather than the four convictions he insisted he had. *See supra* at 15-17. Any possible negative effect of the additional prior conviction (and even Murrell's explanation of the mixup in the record) was at most marginal. Moreover, we note that Murrell himself could have avoided any questioning and follow-up explanation of the nature of his prior convictions if only he had been candid regarding the number of convictions on his record. Instead, he was less than truthful and refused to admit that he did in fact have six criminal convictions on his record.

Considering that the evidence of guilt against Murrell was most convincing and overwhelming (eyewitness testimony of Burrage, Davis, corroborating testimony of Arndt, Henson, Shaw), and that Murrell would have, in any case, had to admit to five prior convictions, there is no reasonable likelihood that "but for" counsel's failure to correct the information regarding Murrell's prior record, the jury would have reached a different conclusion as to Murrell's guilt.

## *III. Conclusion*

This case is about credibility determinations first and last, initially made by a competent jury of Murrell's peers during a five-day trial, and then reviewed by the trial judge during post-conviction proceedings, as well as the state appellate court on direct review. At trial, in the face of all of the evidence presented to it, including the damning testimony of Jermaine Burrage, Christopher Davis, and three police officers, the jury concluded that Murrell was guilty beyond a reasonable doubt of each and every element of the five counts of first-degree reckless injury charged against Murrell in connection with the shooting at the Roxbury Club (October 25, 1993).

During post-conviction proceedings, the trial judge, when presented with the testimony of Danny DeNeal, Briant Horton, and a transcript of the prior testimony of Christopher Davis (probation revocation hearing), found that the exclusion of such testimony from the trial itself (or, in the case of Davis's testimony, the failure to impeach using a prior inconsistent statement) did not rise to the level of prejudicing Murrell. The experienced and very well-respected trial judge had ample opportunity, both during trial and post-conviction proceedings, to observe the conduct and demeanor of each one of the witnesses, focusing on their "'reactions and responses to the interrogatories, their facial expressions, attitudes, tones of voice, eye contact, posture, and body movements,'" *Dunning v. Simmons Airlines*, 62 F.3d 863, 868 (7th Cir. 1995) (alteration in original), unlike this Court which has access only to the cold pages of the appellate record. The trial judge's conclusion that counsel's alleged deficiencies were not prejudicial was inextricably linked to her credibility determinations made throughout the course of the proceedings.[23] To second-guess the factual conclusions of an experienced state trial judge would be contrary to applicable law. *See Mendiola*, 224 F.3d at 592 (discuss-

---

[23] Concerning Horton, the trial judge made the express finding that his testimony was "*not credible*." *Wisconsin v. Murrell*, No. F-934492, at 15 (Wis. Cir. Ct. May 30, 1997). The trial judge also concluded that Horton's testimony was not enough to undermine the "strength" of evidence linking Murrell to the gun, *including the testimony of Christopher Davis and witnessing police officers. Id.* As to Danny DeNeal's testimony, the trial judge did not make her findings of credibility explicit, and the rebuttable presumption of § 2254(e) does not apply. Nonetheless, the Wisconsin Court of Appeals' application of the *Strickland* standard to counsel's failure to call Danny DeNeal was reasonable (in light of his ever-changing testimony), and must not be disrupted on collateral review under § 2254(d)(1).

ing applicability of 28 U.S.C. § 2254(e)(1) to state court credibility determinations).

On appeal from the trial judge's order denying a new trial, the Wisconsin Court of Appeals agreed with the finding that Murrell had failed to establish prejudice. We are convinced, after a reading of the state appellate court's decision, which highlights the wealth of damning and inculpatory evidence that supported the jury's conviction and the trial judge's denial of a new trial in the case, *that the Court of Appeals "t[ook] the [Strickland standard] seriously and produce[d] an answer within the range of defensible positions." Mendiola*, 224 F.3d at 591 (emphasis added). Thus, under the terms of the AEDPA, it is clear that the district court's denial of the writ was entirely proper.

In closing, we note that although Murrell's trial may not have been perfect, "the United States Constitution *does not guarantee a perfect trial, only a fair trial." United States v. Harris*, 271 F.3d 690, 704 (7th Cir. 2001) (emphasis added). And in this case, when considering Murrell's allegations of deficient performance, both singly and cumulatively, we are convinced that, in light of the immense inculpatory evidence presented at trial (both circumstantial and direct), and the incredibility of Horton and De-Neal, the Wisconsin Court of Appeals' conclusion that trial counsel's errors were not prejudicial was not only *reasonable*, but represented a proper application of *Strickland*. Murrell was entitled to and received a fair trial before a jury of his peers that convicted him of each and every element of each of the five counts of reckless injury charged. The district court's denial of Murrell's petition for habeas relief is AFFIRMED.

POSNER, *Circuit Judge*, dissenting. David Murrell was convicted by a jury in a Wisconsin state court of five counts of first-degree reckless injury while armed and was sentenced to prison for 75 years. The only issue presented by the appeal is whether the state courts were unreasonable in rejecting his claim of ineffective assistance of counsel at his trial—technically, whether they were unreasonable in applying to the facts of the case the decision of the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984); see 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,* 529 U.S. 362, 404-05 (2000). Since the state concedes that Murrell's trial lawyer fell below the minimum required level of professional competence in representing him, all that we must decide is whether the state courts were unreasonable in finding that the defendant would surely have been convicted even if his lawyer had been up to snuff. I think they were.

Murrell was one of nearly 500 people who were enjoying themselves one night in 1993 at a nightclub in Milwaukee's inner city. While he was in the bathroom gambling, a fight broke out between several of his "friends" and members of another group, the "One-Way Boys." It is apparent from the record that these were gangs, and not friendly ones either; had there been no preexisting animosity between them, a shooting would not have been likely to ensue from someone's bumping into another person on the dance floor. The contestants included Carl Owens and members of the rival gang including the brothers Jermaine and Mario Burrage, though Jermaine denied that he was a member, while acknowledging that his friends were. Shooting broke out and five men were injured (happily none fatally), including Mario Burrage. Murrell and Owens were prosecuted together for the shootings. Jermaine Burrage testified that just prior to the shooting he had gone into the bathroom, where he had seen Murrell, and that Owens had burst in and asked Murrell to give

him a gun "because it's drama." In response, according to Burrage, Murrell drew out a semiautomatic pistol, loaded and cocked it, left the bathroom, and fired five or six shots into the crowd. Before trial Burrage had also said that Murrell had left the bathroom in the company of Owens and that the two had been standing side by side during the shooting. But at trial Burrage testified that he did not remember where Owens had been standing. As a result, the judge ordered the case against Owens dismissed.

As a member of a rival gang whose brother had been one of the victims of the shooting, and having contradicted his prior statement regarding Owens, Burrage was not a highly credible witness. He testified that he had given the account that he gave at trial to a police officer or security guard at the scene of the shooting, but the evidence at trial was that no one had taken a statement from him; nor did any officer or guard match the description that Burrage gave of the person to whom he had given the statement. He first called the police the morning after the shooting. His story was discrepant with other evidence offered at the trial as well, and it also contradicted itself with respect to the size of the gun, what hand Murrell had held it in, where Murrell was when he started to shoot, and who else was in the bathroom.

The key evidence against Murrell was given by a security guard at the nightclub named Christopher Davis. Davis testified that he had seen Murrell leave the club after the shooting, clutching his side as if he were hiding a weapon, and that when he asked Murrell to stop, Murrell ran away and tossed a pistol under a car. The pistol was later recovered—and sure enough it was the one that had been used in the shootings. This iced the case against Murrell.

Yet at a probation revocation hearing conducted before the trial, Davis had testified that he had *not* seen Murrell

holding or tossing the gun, that rather the nightclub's bouncer, Danny DeNeal, had told him that he (DeNeal) had seen Murrell drop the gun. Davis had made a similar statement to Murrell's original lawyer, who had turned it over to Murrell's trial lawyer, who had done nothing with it. The lawyer was also shown a statement that DeNeal had given to the police the night of the shootings to the effect that he had seen a man, who from his description could not have been Murrell, run from the scene of the crime and toss the gun—the very gun that had done the shooting—under a parked car. The lawyer did nothing with this statement either. He neither impeached Davis with his prior inconsistent statements—one of which, the one at the probation revocation hearing, had been under oath—nor called DeNeal as a witness. He acknowledged having no tactical reason for these omissions, which is why the state does not argue that he rendered competent professional assistance to Murrell. At a state postconviction hearing, DeNeal recanted his statement that he had seen who had tossed the gun; this cast a shadow over Davis's testimony that DeNeal had told him the night of the shooting that he had seen Murrell toss the gun.

Impeaching Davis with his prior inconsistent statements and calling DeNeal as a witness to contradict Davis's present testimony would have neutralized Davis as a prosecution witness, leaving the state's entire case to rest on the narrow shoulders of Burrage—who, to repeat, was a member of a rival gang, whose brother had been shot, and who was an unreliable witness, having in effect recanted at trial a key portion of his statement to the police. Had Davis been neutralized in the manner indicated, Murrell might well have been acquitted. In his closing argument, the prosecutor emphasized that Davis's credibility had not been impaired—indeed not, because of the failure of Murrell's lawyer either to impeach

Davis with Davis's prior inconsistent statements or to put DeNeal on the stand to contradict Davis's testimony.

In finding (by a split vote) that the lawyer's pratfalls had not prejudiced Murrell, the state appellate court erroneously stated that Davis's testimony that he had seen Murrell toss a gun had been corroborated by the testimony of other officers; actually they were merely repeating what Davis had told them and thus uttering inadmissible and unreliable hearsay. *State v. Peters*, 479 N.W.2d 198, 201-02 (Wis. App. 1991). My colleagues repeat this mistake. It is true as they point out that much of Davis's testimony was corroborated, but not the crucial part of it. On cross-examination by Murrell's trial lawyer, Davis emphatically repeated his emphatic direct testimony that he had seen Murrell toss the gun. Compare this with his testimony at the revocation hearing:

> Q: Did you ever actually observe David Murrell with a gun in his possession?
>
> A: No, I didn't.
>
> Q: You didn't actually see David Murrell drop a gun.
>
> A: No, I didn't.

What is true as my colleagues emphasize is that Davis also testified at that hearing that someone had called out "'He dropped it, he dropped it.' I looked down, and lo and behold, it was there on the ground, right—he had just passed that point, I know that." But at trial he testified that he had not heard anyone say "he dropped the gun." It was *he* who had said it: "No one screamed there was a gun until after that gun hit the ground. That's when I screamed 'there's a gun.'"

All this would be of little moment had there been no one besides Murrell (except Davis) in the parking lot, so that only Murrell could have dropped the gun. But the only evidence to support this suggestion was the testimony of

one of the officers that Davis and Murrell were the "first two people [that he saw] leaving the area." Davis himself testified that there was a "stampede" and that Murrell left *after* the stampede; another officer referred to a "mass exodus." The surveillance videotape confirmed that at least one person left the club before the person who the state argued was Murrell clutching his side left seven seconds later, and that that person also appeared to be holding something. At least two more people ran out just seconds after Murrell.

According to the state appellate court, another officer identified Murrell as the man seen on the video leaving the club clutching his side, and thus corroborated a part at least of Davis's testimony, though not the critical part. The court was again mistaken about the record. The officer said he was unable to identify the person clutching his side because of the poor quality of the videotape, and that he had based his identification of Murrell not on his own first-hand knowledge but on what Davis had told him: more hearsay, which would have unraveled had Davis been impeached by his testimony at the revocation hearing.

My point is not that the state courts misapplied the rules of evidence, a matter (in the first instance at least) of state law; it is that in assessing the harm to the defendant from his lawyer's performance they misconstrued the trial record and as a result slighted that harm. The fact that they considered Davis believable was vitiated by the errors that I have noted, and anyway the question is not whether they believed Davis but whether a competent lawyer would have so undermined Davis's credibility as to persuade the jury to acquit Murrell.

As for DeNeal, it is true as the court pointed out that at the postconviction hearing he recanted his statement that he had seen someone who could not have been Murrell

toss the gun. But his new version was that neither he nor Davis had seen who tossed the gun, and the jury might have believed this and so rejected Davis's testimony—or believed DeNeal's original statement, made to the police on the night of the shootings, that he and Davis had pursued several patrons who had fled the scene of the shooting; that he had observed a short, black male with a shaved head and multi-colored sweater (not Murrell) dump a handgun underneath a car in the parking lot; that he had told Davis that the man dropped the gun; and that he (DeNeal) remained near the gun until the police officers arrived. This statement was consistent with Davis's statement at the revocation hearing that DeNeal, not Davis, had seen someone toss the gun, but of course if believed it would tend to exonerate Murrell.

To this my colleagues respond that DeNeal's statement about the short bald guy was false and his testimony at the postconviction hearing "outlandish." But as the ground for Davis's belief that Murrell was the gun-tosser was DeNeal's say-so, it is hard to see how DeNeal's lack of credibility is helpful to the state. As my colleagues remark, though without embracing the implications of the remark, "if DeNeal could not be trusted to tell the truth when he was under oath, we fail to see how something he said outside the courtroom, when he was not under penalty of perjury, would have been accepted by the jury." Precisely; and it was outside the courtroom that DeNeal supposedly told Davis that Murrell had dropped the gun. It is not as if DeNeal were a friend of Murrell's, with a motive to lie to protect him; he was not; on the contrary, he was a colleague of Davis—both were members of the nightclub's security staff—and attempted to apprehend the shooter.

A friend of Murrell's, an eyewitness to the shooting named Horton, asked Murrell before the trial to tell Murrell's lawyer to contact him. The lawyer did not do so. Horton would have testified that he had been looking

at Murrell when he heard the shots, and that Murrell had not fired them. Horton's testimony would not have done much for Murrell, standing alone—except to neutralize Burrage's unconvincing testimony. (Horton, it is true, was a friend of Murrell—but Burrage was an enemy.) If in addition to calling Horton as a witness, Murrell's lawyer had brought out the fact that Davis had not seen who had dropped the gun—that in testifying that it was Murrell, Davis had just been parroting DeNeal, a thoroughly unreliable witness—Murrell might well have been acquitted. The state courts were unreasonable in concluding otherwise. He is entitled to a new trial.

A true Copy:

     Teste:

 

 

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*